## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SCOTT McLAUGHLIN,       )
                                )
        Petitioner,      )
                                )
      vs.             )      Case No. 4:12CV1464 CDP
                                )
TROY STEELE,          )
                                )
        Respondent.     )

## MEMORANDUM AND ORDER

Petitioner Scott McLaughlin is currently on death row at the Potosi Correctional Center in Mineral Point, Missouri, for the murder of Beverly Guenther. Petitioner was convicted by a jury in St. Louis County of first-degree murder, forcible rape, and armed criminal action. The jury found him not guilty of a second count of armed criminal action. After the jury deadlocked on punishment, the trial judge sentenced Petitioner to death for the murder. The judge also imposed consecutive life sentences for the rape and armed criminal action convictions.

This action is before me now on Petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Two of Petitioner's claims warrant relief. First, in what is referred to here as Petitioner's Claim 1A, petitioner alleges that defense counsel was ineffective for failing to conduct an adequate investigation

into a psychiatrist he intended to call as an expert witness during the penalty phase of the case. Because of the inadequate investigation, counsel decided at the last moment not to call the psychiatrist, and so did not present any medical evidence on the statutory mitigating factors of extreme emotional disturbance and that petitioner lacked the capacity to conform his conduct to the requirements of the law. Post-conviction counsel failed to raise this claim, and so it was not considered on the merits by the Missouri courts. But the evidence shows that postconviction counsel knew of this issue and its significance well in advance of the relevant deadline, planned to address it in his postconviction motion, and then inexplicably failed to raise it in accordance with Missouri's postconviction procedure. The omission prejudiced Petitioner, who to date has received no merits adjudication of the underlying claim. Postconviction counsel's error constituted ineffective assistance of counsel, which – under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) – requires this court's review of the underlying claim. In conducting that review, I find that trial counsel's cursory investigation of psychiatrist Dr. Caruso was such a grievous oversight that it both failed to comport with professionally prevailing norms and also prejudiced Petitioner at sentencing. These errors together violated Petitioner's Sixth Amendment right to counsel and require resentencing.

Second, because of the wording of the special verdict form used in this case, the court could not have known whether the jury concluded that the mitigating circumstances surrounding the murder outweighed the aggravating circumstances. That weighing is a finding of fact that Missouri state law requires and the Sixth Amendment reserves for a jury. The judge's imposition of a death sentence without a jury finding on this mandatory factual predicate was a violation of the Sixth, Eighth, and Fourteenth Amendments as described in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Mills v. Maryland*, 486 U.S. 367 (1988). The Supreme Court of Missouri's affirmation of Petitioner's death sentence was based on an objectively unreasonable application of *Ring* and was contrary to *Ring* and *Mills*. This error, raised in Petitioner's Claim 3, also requires resentencing.

Petitioner raises 10 other grounds for relief. These remaining claims and subclaims are procedurally barred or fail on the merits.

## I.     FACTUAL BACKGROUND

The following recitation of facts comes from the opinion of the Supreme Court of Missouri affirming the conviction and sentence in this case:

> The evidence at trial, considered in the light most favorable to the jury's verdict, shows that Scott McLaughlin and Beverly Guenther began a tempestuous relationship shortly after they met in 2002. For several months, the two lived together, but their cohabitation was marked by break-ups that were sometimes so serious that Ms. Guenther would obtain a restraining order against Mr. McLaughlin. In the spring of 2003, they ended their amorous relationship, but continued to see each other on social occasions. Throughout their

relationship, Mr. McLaughlin frequently called and visited Ms. Guenther at her place of employment.

On October 27, 2003, Mr. McLaughlin was arrested and charged with burglarizing Ms. Guenther's home. He claimed that he was reclaiming things that he left at her house after they stopped living together. He was arraigned on the burglary charge on November 18, 2003. Based on this incident, Ms. Guenther sought and received an order of protection against Mr. McLaughlin. On November 20, 2003, while the protective order was still in effect, he drove to Ms. Guenther's place of employment and waited for her to get off of work. When she emerged from the office, he spoke with her as she walked towards her truck.

The state presented expert testimony that the blood spatters and other physical evidence in the parking lot and truck suggested that Mr. McLaughlin at that point forced Ms. Guenther to the ground and raped her, then stabbed her repeatedly, causing a fan-shaped blood stain on the parking lot, and then dragged her body to his car and placed it in the hatchback. Mr. McLaughlin then drove to the river with the intention of disposing of her body. He tried to deposit her body in the river, but ran into some thick underbrush along the bank and left her corpse there. He then returned to sleep in his parked car because one of the tires had become flat when he stopped to dispose of the body.

The next day, Mr. McLaughlin cleaned out the inside of his car with bleach. As the day went on, he became increasingly hyperactive and nervous. Eventually, Mr. McLaughlin asked a friend to take him to a hospital in St. Charles so that he could get some medication for his mental disorder. The police were informed that Mr. McLaughlin was going to be at the hospital, and he was arrested when he arrived.

*State v. McLaughlin*, 265 S.W.3d 257, 260 (Mo. banc 2008), *cert. denied*, 556 U.S. 1165 (2009).

## II.    PROCEDURAL BACKGROUND

Based on his actions described above, Petitioner was convicted by a jury of first-degree murder, armed criminal action, and forcible rape.  The jury deadlocked partway through Missouri's multistep capital sentencing process and completed a special verdict form.  The trial judge then imposed a sentence of death for the murder and consecutive life sentences for the rape and armed criminal action. Petitioner appealed certain aspects of his convictions and sentences.  The Supreme Court of Missouri rejected Petitioner's direct appeal in August 2008 and denied rehearing the following month.  *Id.*

Petitioner then brought a motion in the Circuit Court of St. Louis County, Missouri, for postconviction relief under Mo. Sup. Ct. R. 29.15.  The motion court granted in part and denied in part a motion for an evidentiary hearing on Petitioner's postconviction claims.  After a four-day hearing on several of Petitioner's claims, the motion court denied in full the Rule 29.15 motion.  The Supreme Court of Missouri affirmed the denial and again denied rehearing. *McLaughlin v. State,* 378 S.W.3d 328 (Mo. banc 2012).

Petitioner then filed this federal petition for a writ of habeas corpus under 28 U.S.C. § 2254.

## III.   GROUNDS RAISED

Petitioner seeks habeas relief on the following grounds:

1.      Defense counsel was constitutionally ineffective at the penalty phase of trial for:

A. failing to conduct an adequate investigation into Dr. Caruso, and as a result, failing to present testimony from a psychiatrist (Claim 1A),

B. failing to investigate, retain, and present expert testimony from a neuropsychologist that Petitioner suffered from brain damage and other neuropsychological impairments at the time the murder was committed (Claim 1B), and

C. failing to investigate and present available school, medical, and jail records regarding Petitioner's mental illnesses and intellectual impairments (Claim 1C).

2.      The trial court violated Petitioner's Eighth and Fourteenth Amendment rights by instructing the jury they could not consider Petitioner's school, medical, and jail records as substantive mitigating evidence during the penalty phase of trial (Claim 2A), and his counsel was constitutionally ineffective for failing to object to these instructions (Claim 2B).

3.      The trial court's imposition of a death sentence violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights because Missouri's sentencing statute and jury instructions permitted the trial court, rather than the jury, to make findings of fact required to render Petitioner eligible for the death penalty.

4.      Defense counsel was ineffective for failing to investigate and present evidence that Petitioner's brother raped the victim.

5.      The trial court improperly admitted hearsay statements of the victim, which violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

6.      The prosecutor's penalty phase closing argument was constitutionally improper because he compared the jurors to soldiers in wartime, expressed personal opinions, and referred to facts not in evidence (Claim 6A), and defense counsel was ineffective for failing to object (Claim 6B).

7.     The trial court violated Petitioner's Eighth and Fourteenth Amendment rights by refusing to submit to the jury the lesser included offense of felony murder.

8.     The "depravity of mind" aggravating circumstance upon which the State relied in seeking Petitioner's death sentence is impermissibly vague and excessively broad under the Eighth and Fourteenth Amendments.

9.     Victim impact evidence presented at the penalty phase of trial was so unduly prejudicial as to violate Petitioner's due process rights under the Eighth and Fourteenth Amendments.

10.     There was legally insufficient evidence to support Petitioner's rape conviction.

11.     The trial court's refusal to use language required by Mo. Rev. Stat. §565.062 for instructing the jury at a capital sentencing violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

12.     The trial court violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights by excluding as mitigating evidence testimony from Petitioner's cousin concerning incriminating hearsay statements that Petitioner's brother had made to her.

## IV.     STANDARD OF REVIEW

Most of Petitioner's claims are governed by the standard of review set out in

28 U.S.C. § 2254(d).  Under this section, if a state court has adjudicated a claim on

its merits, a federal court may not grant habeas relief unless the state court

adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This standard is deliberately "difficult to meet." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013). Before obtaining relief, a prisoner must show that the state court decision under review was "so lacking in justification" that there is "no possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

A federal habeas court applies the standard of review contained in Section 2254(d) to the "last reasoned opinion" of the state courts. *See Winfield v. Roper*, 460 F.3d 1026, 1037-38 (8th Cir. 2006) (where 29.15 motion court denied claim as untimely and Missouri Supreme Court did not address claim at all, motion court's denial was the "last reasoned opinion" and provided an independent and adequate state ground barring consideration unless petitioner demonstrated cause and prejudice or miscarriage of justice).

### A. *Subsection 2254(d)(1)*

The "clearly established Federal law" described in this subsection includes only holdings, not dicta, from the United States Supreme Court. *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012). Holdings sometimes announce guiding principles, and courts need not "wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). The

more general the holding, the broader the range of reasonable applications thereof. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Nonetheless, "even a general standard may be applied in an unreasonable manner." *Panetti*, 551 U.S. at 953.

Federal law is "clearly established" if Supreme Court precedent has supplied a "clear answer" to the question presented, and that answer may be derived from multiple cases. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *see also Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (state court determination that defense counsel had been effective was unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) as applied to failure-to-investigate claims in *Wiggins v. Smith*, 539 U.S. 510 (2003)); *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (relief would be granted only if state court decision was contrary to or unreasonably applied "this Court's applicable holdings"); *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 257-58 (2007) (relief granted because state court decision was contrary to and unreasonably applied Supreme Court's "most relevant precedents"); *Tyler v. Cain*, 533 U.S. 656, 666 (Court) and 672 (Breyer, J., dissenting) (2001).

The "contrary to" and "unreasonable application of" standards also described in this subsection are distinct. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by the Supreme Court on a question of law" or "arrives at a result opposite to one reached by the Supreme

Court on materially indistinguishable facts." *Addai v. Schmalenberger*, 776 F.3d 528, 532 (8th Cir. 2015).

A state court's decision is "an unreasonable application of" clearly established federal law only if it was "objectively unreasonable, not merely wrong." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (noting that "clear error" is insufficient). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. A state court decision may be both "contrary to" and an "unreasonable application of" clearly established federal law. *Abdul-Kabir*, 550 U.S. at 258.

**B. *Subsection 2254(d)(2)***

A state court's decision is based on "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," as required to grant habeas relief under subsection (2), only if the petitioner "shows by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." *Lomholt v. Iowa*, 327 F.3d 748, 752 (8th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1) (clear and convincing evidence standard)); *see also Barnes v. Hammer*, 765 F.3d 810, 814 (8th Cir. 2014).

Like under the standard articulated in subsection (1), a federal habeas court may not grant relief under subsection (2) just because it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010). Instead, a petitioner must show that the determination of facts was "objectively unreasonable." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (Section 2254(e)(1) standard is "demanding but not insatiable").

## V.     DISCUSSION

### A.     *Claim 1A: Failure to investigate Dr. Caruso*

In his first claim, Petitioner argues that his trial counsel was constitutionally ineffective for "failing to investigate, retain, and present the testimony of a qualified psychiatrist" at the sentencing phase of his trial. Specifically, he claims that trial counsel's investigation of psychiatrist and mitigation expert Dr. Keith Caruso was constitutionally inadequate. Trial counsel had retained Dr. Caruso to examine Petitioner and testify about his mental health during the penalty phase of Petitioner's trial. While the jury was deliberating in the guilt phase, Dr. Caruso informed counsel of professional misconduct during medical school that might have subjected him to serious impeachment. Based on this information, counsel decided not to call him to testify. That left Petitioner with no mitigation evidence from a mental-health professional who had examined him clinically as an adult or

who could testify about his mental state at the time of the murder.  Petitioner

asserts that counsel's errors violated his Sixth Amendment right to counsel as set

forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) and applied in

*Wiggins v. Smith*, 539 U.S. 510 (2003).

### i.     *Strickland* **standard**

Under *Strickland*, a petitioner first must identify specific acts or omissions

made by counsel that "were outside the wide range of professionally competent

assistance."  *Id.* at 690.  Second, a petitioner must demonstrate that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  *Id.* at 694; *see also Pryor v. Norris*, 103

F.3d 710, 713 (8th Cir. 1997) (petitioner must satisfy both prongs).  For alleged

errors during the penalty phase of a capital trial, Petitioner "must demonstrate that

there is a reasonable probability that absent counsel's inadequate representation,

the jury would not have sentenced him to death."  *Winfield v. Roper*, 460 F.3d

1026, 1033 (8th Cir. 2006); *see also Strickland*, 466 U.S. at 694 (same standard

applies where sentence is imposed by judge).  For *Strickland* purposes, a

"reasonable probability" is "one 'sufficient to undermine confidence in the

outcome.'"  *Id.* (quoting *Wiggins*, 539 U.S. at 534)).

In Missouri, *Strickland* claims are not cognizable on direct appeal. Instead, such a claim may be brought for the first time in a collateral postconviction proceeding under Mo. Sup. Ct. R. 29.15.

## ii.     *Cause and prejudice*

Petitioner failed to raise this claim that counsel was ineffective in his amended Rule 29.15 motion, which was the first opportunity he had to do so in state court.[1] He tried to raise it on appeal, but the Missouri Supreme Court declined to consider it.[2] *McLaughlin v. State*, 378 S.W.3d at 340 (McLaughlin's "allegations regarding the requisite investigation into Dr. Caruso are not preserved for appeal and will not be addressed"); *see also State v. Clay*, 975 S.W.2d 121, 141 (Mo. banc 1998) (issues not raised in Rule 29.15 motion are waived on appeal).

The Missouri Supreme Court's rejection of the claim for failure to follow a state procedural rule constitutes an "independent and adequate" state ground that would normally preclude review of the claim by a federal habeas court. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A habeas petitioner can only overcome

---

[1] Petitioner had first filed a *pro se* motion, which similarly did not contain any explicit reference to counsel's inadequate investigation of Dr. Caruso. Once a postconviction movant is appointed counsel and that counsel files an amended Rule 29.15 motion, the *pro se* motion is superseded and rendered a nullity. *E.g., Tinsley v. State*, 258 S.W.3d 920, 927 (Mo. Ct. App. 2008). Thus, the claims in the amended Rule 29.15 motion were "the only matters before the motion court." *Day v. State*, 143 S.W.3d 690, 693 (Mo. Ct. App. 2004).

[2] Capital postconviction appeals in Missouri bypass the intermediate appellate courts and go directly to the Missouri Supreme Court. MO. CONST. Art. V, §§ 3, 10; standing order of June 16, 1988; *see also Hall v. State*, 16 S.W.3d 582, 584 (Mo. banc 2000).

this procedural bar by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Id.*

"Cause" must be "something *external* to the petitioner, something that cannot fairly be attributed to him." *Id.* at 753 (emphasis in original). The Supreme Court qualified this definition in *Martinez v. Ryan*, 132 S. Ct. at 1320. In that case, the Court held for the first time that a petitioner can establish cause by demonstrating that his initial-review postconviction counsel was constitutionally ineffective for failing to raise a "substantial" claim of ineffective trial counsel.

A substantial underlying claim is one that has "some merit." *Id.* at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003), and thereby incorporating standard for issuing a certificate for appealability). "Substantial," in other words, means "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336.

Relying on *Martinez*, Petitioner requested an evidentiary hearing before this court on the question of whether his postconviction initial-review counsel's failure to raise the Dr. Caruso claim constituted "cause." Respondent did not oppose the motion. I determined that the underlying ineffective-trial-counsel claim was substantial because trial counsel had conducted no investigation whatsoever into

Dr. Caruso's credentials and had, as a result of excluding him at a late hour, presented no testimony from any mental health practitioner who could comment on Petitioner's psychological state at the time of the murder. Therefore, I granted Petitioner's request and held a hearing on May 11, 2015. [CM/ECF Doc. No. 57.] *See Sasser v. Hobbs*, 735 F.3d 833, 853-54 (8th Cir. 2013) (finding the procedural default of four potentially meritorious ineffective-trial-counsel claims excused under *Martinez* and reversing district court denial of request for evidentiary hearing on those claims).

### iii.     *Ineffective assistance of postconviction counsel*

At the hearing, Petitioner presented testimony from five witnesses: trial co-counsel Robert Steele; postconviction motion attorneys Pete Carter and Valerie Leftwich; postconviction motion mitigation specialist Cindy Malone; and postconviction appellate counsel Melinda Pendergraph. These witnesses all worked for the Missouri Public Defender System and were responsible for Petitioner's Rule 29.15 motion.

Although the witnesses had represented numerous capital defendants and their representation of Petitioner had begun more than seven years ago, they all testified emphatically that they remembered the Dr. Caruso situation. One reason was that Petitioner's co-trial counsel, David Kenyon, had told the court on the record that he was worried that he had been ineffective. The postconviction team

testified that, when they are first assigned a case, they read the transcript first. As such, they learned of this potential claim almost immediately after receiving Petitioner's case:

> Respondent's attorney: What was your reaction when you read [the exchange between Mr. Kenyon and the Court]?
>
> Ms. Malone: Well, when I read it, I'm like, "Well, there you go. He's handing it to you on a silver platter." One of our issues.

(Evid. Hrg. Tr. 53:3-6 [CM/ECF Doc. 66]; *see also* Pendergraph testimony, Hrg. Tr. 84:2-6 ("It's not very often we have trial counsel admit they screwed up at trial.")).

The postconviction witnesses testified that it is their usual practice to divide the claims to be presented in a Rule 29.15 motion among the various lawyers on the team. They had discussed the Dr. Caruso claim on multiple occasions, both formal and informal, and agreed that Mr. Carter would brief that claim. On the date the motion was due, Ms. Leftwich took Mr. Carter's claims and her own and appended them into a single document, but she did not recall reading his claims. (Evid. Hrg. Tr. 70:13-71:10.) No one recalled whether Mr. Carter had provided a draft beforehand, but Ms. Malone and Ms. Leftwich agreed he sometimes did not

do so.  (Evid. Hrg. Tr. 56:16-24, 69:25-70:6.)  It was undisputed that no one caught the omission until after the brief had been submitted.[3]

Ms. Leftwich, Ms. Malone, and Ms. Pendergraph all testified that they realized the claim had been omitted before the Rule 29.15 evidentiary hearing, discussed it amongst themselves, and were not pleased.  They had allocated resources to hire a psychiatrist to evaluate Petitioner and present testimony at a postconviction hearing, and they believed that testimony had no value without a claim based on the failure to investigate Dr. Caruso and the resulting failure to call a psychiatrist during mitigation.  Counsel attempted to remedy the oversight by eliciting testimony (at the 29.15 hearing) from Mr. Kenyon about Dr. Caruso, and later, unsuccessfully arguing to the Supreme Court of Missouri that the claim had been sufficiently raised.  Ms. Leftwich testified that it was a "major omission"; Ms. Pendergraph stated that she had been "very shocked."  She testified that she had complained to Mr. Carter's supervisor.  (Evid. Hrg. Tr. 85:3-15.)  Ms. Malone testified that she was "really upset" because the team "had discussed this over and over and over again."  (Evid. Hrg. Tr. 55:1-4.)

---

[3]  Missouri has no procedure for amending a Rule 29.15 motion a second time once a petitioner is represented by counsel, *Leisure v. State*, 828 S.W.2d 872, 878-79 (Mo. banc 1992), nor for reviewing a defaulted claim on appeal under a "plain error" standard.  *Hoskins v. State*, 329 S.W.3d 695, 699 (Mo. banc 2010); *Johnson v. State*, 333 S.W.3d 459, 471 (Mo. banc 2011).

Mr. Carter, for his part, agreed that the Dr. Caruso claim had been his responsibility. He testified credibly that he had intended to raise it,[4] but he gave no reason he had not done so:

Petitioner's attorney: Have you had the opportunity to review the amended postconviction petition [for this hearing]?

Mr. Carter: I have.

Q: Is – where in there is Dr. Caruso mentioned?

A: No, not – not specifically that I could see.

Q: Okay. Is there any specific allegation that trial counsel were ineffective for failing to investigate the credentials of Dr. Caruso?

A: No, there's not.

Q: Why wasn't it raised if it was a spotted and identified issue?

A: I – I'm sorry. I have no idea why it wasn't raised that way. I – I – I've – I have no reason to know. I mean I don't know. I honestly don't know.

Q: Okay. And just so we're clear, there's not a tactical reason for not raising it?

A: I'm sorry?

Q: Is there a tactical reason for not raising this point?

A: Oh, no, no. None.

Q: Okay. When did you realize that the claim had been missed?

---

[4]  Mr. Carter had cited the appropriate failure-to-investigate cases, as required by Missouri's procedural rules, but then his brief fell silent on the content of a failure-to-investigate claim. (*See* Rule 29.15 motion, ¶ 8(F).)  This mismatch is evidence that it was an oversight.  He also pointed to an expense report he had written, requesting funds to hire a psychiatrist for the purpose of a failure-to-investigate claim and describing what happened with Dr. Caruso.  (Pet.'s Ex. A; *see* Docs. 63, 66 (exhibit received at evidentiary hearing)).

A:     When you came to see me and you came to talk to me prior to my testimony here and showed me the motion and I realized that I had not included the key language.

(Evid. Hrg. Tr. 21:24-22:22.)

Mr. Carter testified that he did not receive a copy of the motion court's decision when it came down and had not sought out a copy himself.  He stated that he was aware that the Missouri courts strictly enforce the state's procedural rules, including the particular formulation of how claims are worded.  *See Storey v. State*, 175 S.W.3d 116, 126 (Mo. banc 2005) (citing *Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978)); (*see also* Evid. Hrg. Tr. 13:3-23.).  His office knew the state insists upon rigorous adherence to those rules by its adversaries at the postconviction stage.  (Evid. Hrg. Tr. 77:17-78:4.)  Yet he did not present the claim in accordance with state procedure.

Had Mr. Carter had any reasonable justification for omitting the claim, this Court would apply the "strong presumption" that his decision was reasonable. *Strickland*, 466 U.S. at 689.  But he gave no reason whatsoever.  Indeed, it is difficult to imagine what tactical justification there could be for bringing nine other postconviction claims alleging ineffective assistance of trial counsel and not bringing the one claim about which trial counsel had expressed concern to the trial court.

Not all mistakes by postconviction counsel have constitutional significance. But here, testimony from his colleagues, and from Mr. Carter himself, demonstrate that his abandonment of the Dr. Caruso claim fell below prevailing professional norms. *See also Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013), *cert. denied in Brown v. Shaw*, 134 S. Ct. 2818 (2014) (appellate counsel's performance fell below prevailing norms where he abandoned a nonfrivolous claim that was both "obvious" and "clearly stronger" than claim he actually presented); ABA Standards for the Appointment and Performance of Counsel in Death Penalty Cases (2003), Guideline 10.15.1(C) and accompanying commentary (postconviction counsel should seek to litigate all "arguably meritorious" issues; commentary specifically advises postconviction counsel that a trial record may be incomplete because the "trial attorney did not conduct an adequate investigation in the first instance").[5] Postconviction counsel's omission was unintentional and unreasoned, and it did not comport with prevailing norms.

Having found that the underlying claim was "substantial" and that postconviction counsel's failure to raise it establishes "cause" for the default, this court must determine whether postconviction's deficient performance caused Petitioner "actual prejudice." *Coleman*, 501 U.S. at 750. As other district courts

---

[5] Although they are not compulsory, codified professional practice standards can provide important guidance on identifying prevailing norms. *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012).

have noted, *Coleman/Martinez* prejudice and *Strickland* prejudice may technically

be two separate inquiries, but they overlap.[6]  They are – under some circumstances

– redundant.  *See Duncan v. Carpenter*, No. 3:88--00992, 2015 WL 1003611, at

\*42 (M.D. Tenn. Mar. 4, 2015); *Gray v. Davis*, No. 1:11CV630, 2014 WL

2002132, at \*4 n.4 (E.D. Va. May 13, 2014).

At least in this case – where postconviction counsel's deficiency was his

complete failure to present a substantial claim – the two types of prejudice are

inexorably related:  if there is a reasonable probability that the sentencing would

have gone differently had trial counsel been constitutionally adequate, there is

necessarily a reasonable probability that the state court would have so found had

postconviction counsel properly presented that underlying claim.  *See Arkansas v.*

*Sullivan*, 532 U.S. 769 (2001) (state supreme court, like all lower courts, must

abide by United States Supreme Court's interpretation of constitutional rights).

Therefore, for the reasons given below, I conclude there is a reasonable probability

that Petitioner would have succeeded on this claim had he raised it to the state

courts in his amended Rule 29.15 motion.

---

[6]  Eighth Circuit precedent is mixed on whether *Coleman* "actual prejudice" requires a stronger showing than *Strickland* prejudice.  *See Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010) (comparing *Charron v. Gammon*, 69 F.3d 851, 858 (8th Cir. 1995) and *Clemons v. Luebbers*, 381 F.3d 744, 752-53 n.5 (8th Cir. 2004)).  Even assuming "actual prejudice" is a more demanding standard, Petitioner has met it here for the reasons discussed *infra*.

## iv.    *Trial counsel's failure to investigate Dr. Caruso*

*Martinez* held that a petitioner's procedural default of a substantial

ineffective-trial-counsel claim on state-law grounds may be excused for cause if

that petitioner's postconviction counsel was himself ineffective.  But

postconviction counsel's inadequacy does not itself entitle that petitioner to relief,

only to review of the underlying claim.  That review is to be conducted *de novo*.

*Dickens v. Ryan*, 740 F.3d 1302, 1321-22 (9th Cir. 2014); *see also Wiggins*, 539

U.S. at 534 (where state denies *Strickland* relief on performance prong and

therefore does not reach prejudice prong, habeas court reviews prejudice *de novo*).

David Kenyon, one of the two attorneys who represented Petitioner at trial,

testified at the Rule 29.15 hearing before the motion court.  He stated that he had

intended to call psychiatrist Caruso to testify during the penalty phase of

Petitioner's trial.  According to Dr. Caruso's reports, Mr. Kenyon had engaged Dr.

Caruso to evaluate Petitioner for competency to stand trial and for possible

mitigating factors.  (*See* CM/ECF Doc. No. 51-2.)

Dr. Caruso had interviewed Petitioner at least twice in September 2005 for a

total of at least seven hours.  In reports he gave to Mr. Kenyon, he opined that

Petitioner had been suffering from numerous psychiatric problems when he

murdered Ms. Guenther.  Dr. Caruso diagnosed recurrent and severe major

depressive disorder with psychotic features, ADHD, alcohol dependence, alcohol

intoxication, "rule out" bipolar disorder, borderline personality disorder, and antisocial personality disorder.  He opined that Petitioner had been under the influence of extreme mental or emotional disturbance at the time of the murder and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law had been substantially impaired at that time. Like other experts, Dr. Caruso also described the substantial trauma and abuse Petitioner had borne during childhood.  Dr. Caruso noted that Petitioner's conditions had improved with medication, which Petitioner willingly took.  (*Id.*)

Mr. Kenyon had hired Dr. Caruso after a mitigation specialist on his team had seen Dr. Caruso speak at a continuing legal education program that focuses on the death penalty.  (29.15 Hearing Tr. 582:21-583:25.)  Mr. Kenyon testified that he did no independent investigation of Dr. Caruso beyond reading his curriculum vitae.  Mr. Steele, Petitioner's other trial counsel, testified that Dr. Caruso had been hired by someone else so Mr. Steele did not investigate his credentials either. (29.15 Hearing Tr. 553:15-554:10, Evid. Hrg. Tr. 41:21-25.)

At the Rule 29.15 hearing, Mr. Kenyon explained why trial counsel ultimately decided against calling Dr. Caruso at trial:

Q:     Can you tell us why he did not testify at trial?

A:     The evening before he was supposed to testify, I received a very late night e-mail from him.  It was while the jury was still deliberating the guilty phase, and I was checking my e-mail from a computer in the St. Louis County [P]ublic [D]efender's Office, and I saw an e-mail

that he had sent me that night telling me that there was one little detail about his background that he hadn't really mentioned to us before, but in the interest of full disclosure, he thought that he probably should.

And he told us or he explained in the e-mail that when he was in medical school, he had been disciplined for altering, fabricating, and destroying primary laboratory data in some type of experiment that he was working on for the National Institute of Mental Health. And he provided me with questions to ask him to rehabilitate him in the event the State was aware of this.

Q: To your knowledge, before you see this e-mail, to your knowledge, was the State aware of this problem?

A: To my knowledge, no.

(29.15 Tr. 585:25-586:22.)

Mr. Kenyon had received that email on the last night of the jury's deliberation on guilt. The following day, September 28, 2006, the jury returned a guilty verdict and the trial immediately proceeded to the penalty phase. Despite now knowing about the misconduct investigation, Mr. Kenyon made an opening statement in which he referred to Dr. Caruso by name and previewed Dr. Caruso's testimony to the jury. His penalty-phase opening statement takes up eight transcript pages. Mr. Kenyon's description of Dr. Caruso's testimony represents one of those eight pages, more than his description of any other evidence:

You will also hear from a psychiatrist named Dr. Keith Caruso. Dr. Caruso evaluated Scott after Scott was incarcerated for the charges which you have convicted him of. Dr. Caruso is a psychiatrist, and he will describe to you the voluminous records that he reviewed. He reviewed school records, psychiatric records, medical records. He reviewed police reports. He reviewed

- 24 -

depositions. He conducted personal interviews with people, and he conducted ten interviews with Scott himself. Dr. Caruso will share with you conclusions that he reached after he evaluated Scott.

He will tell you that he diagnosed Scott with bipolar disorder, and diagnosed Scott also with depression. And it was Dr. Caruso's opinion that at the time these crimes were committed, that Scott McLaughlin was suffering from a depressive episode of bipolar disorder.

Dr. Caruso will tell you that that the time these crimes were committed, that Scott was under the influence of extreme mental or emotional disturbance. Dr. Caruso will also tell you that based on the mental illnesses that Scott had, he does not have the ability to appreciate the criminality of his conduct or to conform to conducts of the requirements of law, which – that he was substantially impaired in this regard.

(Trial Tr. 1487:9-1488:7.)

Before penalty-phase closing arguments, Mr. Kenyon made a statement to the court on the record (but outside the hearing of the jury). He told the court that when he had a chance to return to his own office, he had searched for "Dr. Keith A. Caruso" on Google. The misconduct investigation – memorialized in a document from the United States Office of Research Integrity – was the third result. He read Dr. Caruso's email into the record, as well as the government document he had found. Mr. Kenyon told the court that he became "considerably more concerned" at that point. He met with his boss and his co-counsel "until the wee hours of the morning." His boss opined that Mr. Kenyon would have to turn over Dr. Caruso's email to the State if he were to testify. (Trial Tr. 1950:25-

1955:23.)  Ultimately, Mr. Kenyon decided it would be best not to call Dr. Caruso because he was afraid the potential for impeachment could "seriously harm" Petitioner's case.  (29.15 Hearing Tr. 588:17-20.)  Mr. Kenyon testified at the Rule 29.15 hearing that although he did not plan on submitting the statutory mitigator instruction to the jury, he had planned on asking Dr. Caruso to testify about his conclusion that two mitigating circumstances had been present at the time of the murder.  (29.15 Tr. 588:21-589:16, 590:23-591:592:1.)  This is largely reflected in his penalty-phase opening statement.  (Trial Tr. 1488.)

### *a.* *Penalty-phase evidence*

The Supreme Court of Missouri summarized the penalty-phase evidence that was presented to the jury as follows:

> During the penalty phase of trial, the jury heard victim-impact evidence from Ms. Guenther's family and extensive evidence about Mr. McLaughlin's troubled and abusive childhood. Mr. McLaughlin's biological father was an alcoholic and was abusive toward his mother, a prostitute. When he was taken into the custody of the juvenile division, he lived in multiple foster homes until the age of five, when he and his younger brother and sister were placed with Louise and Harlan McLaughlin, who eventually adopted them. His adoptive parents also were abusive toward Mr. McLaughlin. His adoptive father, a police officer, would hit him with a paddle referred to as the "board of education" and would use his taser and nightstick on him. The McLaughlins often would limit the children's access to food by locking the refrigerator and cabinet doors. Their house was referred to by Mr. McLaughlin's childhood friends as "the house of horrors."

> During the penalty phase, Mr. McLaughlin also presented expert testimony regarding Mr. McLaughlin's psychological and mental problems to the jury. Dr. Anthony Udziela, a psychologist, testified

about extensive intelligence testing the doctor performed on Mr. McLaughlin when he was 9 years old due to poor performance and peculiar behavior at school. The testing indicated that Mr. McLaughlin has a full-scale IQ of 82, which is in the low average range. Dr. Udziela diagnosed Mr. McLaughlin at that time with attention deficit disorder with hyperactivity, expressed language disorder, and adjustment disorder with depressed features.

Mr. McLaughlin also was evaluated when he was 9 years old by Dr. Pasquale Accardo, a pediatrician, for neurodevelopmental impairments. Dr. Accardo found that Mr. McLaughlin suffered from brain impairment, although he could not determine the cause. He testified that Mr. McLaughlin suffered from cognitive limitations, language limitations, and attentional limitations. According to Dr. Accardo's testimony, these limitations were neurologically based.

Dr. Mark Cunningham, a clinical and forensic psychologist, testified about his examination of Mr. McLaughlin that he performed prior to the Rule 29.15 hearing.[7] He also testified about his interviews with Mr. McLaughlin's biological and adoptive family, as well as his extensive review of Mr. McLaughlin's school, prison, and hospital records. Dr. Cunningham testified that the abuse and neglect Mr. McLaughlin was exposed to as a child led to neurodevelopmental problems, such as a low IQ, difficulty with language, issues with visual-spatial cognition, and symptoms of attention deficit disorder with hyperactivity. Dr. Cunningham also identified psychological disorders affecting Mr. McLaughlin as an adult. He diagnosed Mr. McLaughlin with major depression, antisocial personality disorder, and borderline personality disorder. According to Dr. Cunningham's testimony, each of these conditions existed at the time Mr. McLaughlin committed the crimes.

Finally, Mr. McLaughlin presented the testimony of Dr. Sripatt Kulkamthorn, Mr. McLaughlin's treating physician in 2002 and 2003. During that time, Dr. Kulkamthorn found that Mr. McLaughlin struggled from both depression and anxiety. To treat his depression

---

[7] Dr. Cunningham testified at trial, and so his interviews of Petitioner had not only taken place before the Rule 29.15 hearing, but they had also taken place before the penalty phase of the trial, which is more relevant to the Court's discussion.

and anxiety, he prescribed Paxil for Mr. McLaughlin. Mr. McLaughlin was unable to afford the prescription, however, so he only received Paxil during office visits with Dr. Kulkamthorn.

*McLaughlin*, 378 S.W.3d at 335-36.

### b.    State courts' findings on Petitioner's failure-to-call-psychiatrist claim

At discussed above, in his amended motion for postconviction relief, Petitioner did not raise a failure-to-investigate claim. However, Petitioner did argue – without mentioning Dr. Caruso – that Mr. Kenyon had been ineffective for failing to call a psychiatrist. The 29.15 motion court rejected this claim, and the Supreme Court of Missouri affirmed. The motion court ruled that in light of the late hour, the consultation with "not only the entire defense team but also their supervisors in the Public Defender's Office," and the potential for serious harm to Petitioner's case, Mr. Kenyon's decision not to call Dr. Caruso had been "reasonable as a trial strategy." (Legal File p. 185.) The motion court considered the evidence that could have been presented by Dr. Stephen Peterson, a psychiatrist retained at the postconviction stage. The court found that his testimony would have largely been cumulative to Dr. Cunningham's testimony, so Petitioner was not prejudiced by the absence of that evidence.

After finding that no claim related to Dr. Caruso had been properly raised in the motion court, the Missouri Supreme Court made no specific findings related to Dr. Caruso. The Court did, however, hold that counsel had made a "reasonable

strategic choice" not to "seek out additional expert witnesses" based on advice from Dr. Cunningham and Dr. Caruso, who had "concluded that the mental health experts retained were sufficient to testify regarding Mr. McLaughlin's mental health issues." *McLaughlin*, 378 S.W.3d at 342.

In making the decision not to call a psychiatrist or a neuropsychologist, the Court held, "trial counsel knew that Dr. Cunningham was an expert psychologist and conducted extensive interviews of Mr. McLaughlin, his biological family, and his adoptive family," and reviewed Petitioner's records. "Trial counsel also knew that Dr. Caruso, a psychiatrist, formed his advice not to hire another expert or do more testing after an extensive interview of Mr. McLaughlin and his review of Mr. McLaughlin's school records, psychiatric records, and medical records." *Id.* The Court went on:

> Mr. McLaughlin's trial counsel also made a reasonable strategic decision to not call a psychiatrist. . . . Through the testimony of Drs. Cunningham, Accardo, Udziela, and Kulkamthorn at trial, Mr. McLaughlin's trial counsel presented mitigating evidence of impaired intellectual functioning and testified at the Rule 29.15 evidentiary hearing that they did not call Dr. Caruso, a psychiatrist, due to the existence of impeaching evidence that may have harmed the defense's case. The selection of expert witnesses is a matter of trial strategy that cannot be challenged in a Rule 29.15 proceeding. Mr. McLaughlin's trial counsel were not ineffective for failing to present the testimony of Dr. Caruso or an alternative psychiatrist that would present more favorable testimony of Mr. McLaughlin's mental impairments.

*Id.* at 343. The Court held that, even if failing to present evidence from a psychiatrist had been error, Petitioner had not been prejudiced:

Dr. Peterson performed tests on Mr. McLaughlin during the postconviction proceedings and diagnosed him with borderline intellectual and personality disorders, intermittent explosive disorder, and learning disorders. This evidence is cumulative to the testimony of Dr. Cunningham that Mr. McLaughlin suffered from intelligence disorders arising from personality disorders, intellectual disorders, and neurological problems throughout his childhood and adulthood.

*Id.* at 344.

### c. *Petitioner's* **Wiggins** *failure-to-investigate claim*

Petitioner relies upon *Wiggins v. Smith*, 539 U.S. 510 (2003), for his claim that his trial counsel was ineffective in failing to investigate Dr. Caruso's background. The Supreme Court in *Wiggins* held that the defendant's trial attorneys had unreasonably truncated their investigation into their client's life history. Counsel had reviewed the defendant's presentence investigation report and records from the Baltimore City Department of Social Services, but had gone no further. It turned out that the defendant had been neglected and severely abused by his alcoholic mother and, subsequently, by several foster parents throughout his childhood. Counsel had promised the jury in opening statement that they would hear about the defendant's "difficult life," but did not follow through.

The state courts denied the defendant's petition for relief on this ground. The federal district court granted habeas relief, but the appellate court reversed, holding that counsel's strategic decision to focus on another issue during sentencing had been reasonable. The Supreme Court reversed again. It found that

the lawyers' decision could not have been reasonable because it had been based on inadequate investigation into the defendant's background. That cursory investigation was objectively unreasonable, "did not reflect reasonable professional judgment," and fell short of prevailing norms. *Wiggins*, 539 U.S. at 524. Furthermore, "red flags" in the presentence report should also have put counsel on notice that more research was needed. *Id.* at 525.

### d.    *Trial counsel's deficient performance*

*Wiggins* did not modify *Strickland*'s holding that strategic decisions made after thorough investigation are "virtually unchallengeable." *Id.* at 521 (quoting *Strickland*, 466 U.S. at 690). Instead, it held that courts must assess whether the investigation leading to a strategic decision "*was itself reasonable.*" *Id.* at 523 (emphasis in original).

With that in mind, it is clear that in light of the circumstances at that time, trial counsel's "ultimate decision" – made after he discovered the damaging information during the trial – not to call Dr. Caruso was reasonable. *See English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010).[8]   But counsel's representation

---

[8] *English* is a good illustration of why this is not the end of the analysis. In that case, trial counsel did not call as a witness the defendant's girlfriend, who could have corroborated the defendant's version of events. The state courts held that counsel's decision not to call the girlfriend was a reasonable strategy and did not constitute deficient performance under *Strickland*. The federal district court disagreed and granted habeas relief on this ground. The Court of Appeals disagreed with the district court, holding that counsel's failure to call the girlfriend was not unreasonable. *Id.* at 728. But it held that the *failure to investigate* that prompted that last-minute decision was a "distinct (albeit related)" claim that merited habeas

during trial is not the extent of his constitutional duty to his client. *Lafler v. Cooper*, 132 S. Ct. 1376, 1392 (2012) (Scalia, J., dissenting) ("As the Court notes, . . . the right to counsel does not begin at trial. It extends to 'any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.'" (quoting *United States v. Wade*, 388 U.S. 218, 226 (1967)). Counsel should never have been in the situation of deciding, at the last minute, between calling an expert with a serious truthfulness problem and calling no expert at all. *See Wiggins*, 539 U.S. at 533 ("'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (quoting *Strickland*, 466 U.S. at 690-91); *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (trial counsel's failure to call a witness is usually presumed to be reasonable trial strategy, but the "strength of the presumption turns on the adequacy of counsel's investigation" and in *White*, "counsel's investigation was too superficial to reveal" the value of testimony by several potential defense witnesses).

It is, of course, a common practice for capital defense attorneys to rely on mitigation specialists to *propose* potential experts, whom they may eventually call

---

relief on its own: "it was objectively unreasonable for English's trial attorney to decide before trial to call [the girlfriend] as a witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated [the girlfriend] and her story prior to opening statements." *Id.*

to testify in mitigation. But in making the decision whether to retain a particular expert, counsel must do something beyond reviewing what the expert says about himself on his resume. In this case, Petitioner's counsel did not discharge his duty to investigate by hearing secondhand that Dr. Caruso gave a presentation. Indeed, he failed to do much of anything, and under the circumstances of this case, his inaction was constitutionally inadequate. He had not done the groundwork reasonably necessary to make a strategic decision about whether to call Dr. Caruso.[9] *See Smith v. Dretke*, 422 F.3d 269, 284 (5th Cir. 2005) ("If trial counsel's investigation was unreasonable then making a fully informed decision with respect to sentencing strategy was impossible.") (citing *Wiggins*, 539 U.S. at 527-28).

This is not a case where counsel failed to shop around for a more favorable expert or failed to pursue a strategy more fruitful in hindsight: he failed, instead, to investigate the expert he *did* hire and to reasonably develop the strategy he *had* settled on. *Compare Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 n.7 (2011) ("There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'") (quoting *Strickland*, 466 U.S. at 691) (alteration in original); *see also Hutchison v. State*, 150 S.W.3d 292, 307 (Mo. banc 2004) (reversing lower court and granting

---

[9] Mr. Kenyon's co-counsel did not pick up the slack. (*See* 29.15 Hearing Tr. 553:12-23 (when co-counsel entered on the case, Dr. Caruso had already been retained and "I assumed that whoever retained him had done some investigation in to Caruso or was familiar with his work")).

defendant's *Wiggins* claim in part because counsel had failed to follow up after inadequate mental health evaluation).  Competent representation would have included, at a minimum, *some* investigation of Dr. Caruso's background for potential impeachment.  Counsel failed to adhere to prevailing professional norms when he failed to prepare for this possibility by confirming Dr. Caruso's qualifications in some reasonable way.  For example, he could have conducted a brief Internet search (as he did after Dr. Caruso told him of the evidence), or spoken to other defense attorneys who had previously used Dr. Caruso, or even asked Dr. Caruso himself about potential impeachment evidence.[10]  But he did none of these things.  *See Rompilla v. Beard*, 545 U.S. at 389 (counsel was ineffective for failing to review his client's prior conviction file, which was publicly available, when he knew it was likely the prosecutor would use it to prove aggravation); *Bullock v. Carver*, 297 F.3d 1036, 1050 (10th Cir. 2002) ("clearly negligent treatment of . . . an obvious strength of the defense will render an attorney's overall performance inadequate") (internal quotation marks omitted); *Kigozi v. United States*, 55 A.3d 643, 652 (D.C. 2012) (defense counsel's failure to investigate impeachment of state witness amounted to ineffective assistance

---

[10]  The state also argues that counsel reasonably relied on their experts' advice that no other mental health experts were necessary.  This is unreasonable because those opinions were given with the assumption that Dr. Caruso would be testifying.  *See Rompilla*, 545 U.S. at 379 (approving lower court dissent that lawyers had unreasonably relied on family members and experts to tell them what records would be useful rather than reasonably investigating those records themselves).

because "we have no doubt that any competent defense attorney would have appreciated the need to investigate the credibility of the key witness for the prosecution" (internal brackets omitted)).

Nothing in the record suggests any strategic rationale, no matter how farfetched, for failing to conduct this investigation. This is not a case where constraints forced counsel to decide how to allocate limited resources; uncovering the serious impeachment evidence against Dr. Caruso would have taken practically no time or money. It is also not a case where a limited investigation had not suggested the need for followup. Here, counsel obviously recognized the need for psychiatric evaluation, and as a result, chose a mitigation strategy that hinged on testimony from a psychiatrist. In this respect, it is similar to *State v. Johnson*, 968 S.W.2d 686 (Mo. banc 1998). In that case, the Missouri Supreme Court recognized that counsel's failure to communicate with a chosen psychiatric expert had not reflected a reasonable trial strategy. The psychiatrist's testimony had been "the cornerstone of [counsel's] penalty phase strategy," and counsel "had not planned for any other scheduled witness to cover the majority of [the psychiatrist's] testimony, that portion devoted to [defendant's] mental state at the time of the murders." *Id.* at 699. As such, counsel's failure to "solidify arrangements" with the psychiatrist so that he did not end up testifying "fell short of the skill and diligence" required of reasonably competent counsel.

Likewise here, the record demonstrates conclusively that the ultimate failure to offer that testimony to the jury was based on counsel's mistake rather than the result of a tactical decision. *Harrington*, 562 U.S. at 109 (court may not "insist counsel confirm every aspect of the strategic basis for his or her actions" but also may not "indulge *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions") (internal quotation marks omitted); *see also Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir. 2007) (where trial attorneys' investigation was not sufficient to "fully inform[] [the defendant] of all available mitigating evidence and their opinion of its potential effectiveness based on their professional knowledge and experience," counsel was constitutionally ineffective, even when defendant failed to cooperate with counsel).

Not all mistakes are objectively unreasonable, but counsel compounded this mistake in at least two ways. First, there was no built-in redundancy to counsel's penalty-phase strategy. Counsel planned to rely heavily on Dr. Caruso's testimony for the case in mitigation, so the failure to investigate had considerable consequences. Dr. Caruso was a psychiatrist who would have opined that Petitioner had been under the influence of extreme mental or emotional disturbance at the time of the murder and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law had been substantially impaired at that time. None of the other experts that were presented

by the defense presented opinions based on current evaluations of Petitioner or his mental state at the time of the crime. Instead, two of the experts had only examined Petitioner when he was nine years old. Another was a primary care doctor who provided samples of anti-depressants but did little else. And the only other expert was psychologist Dr. Cunningham, who had not done any testing or evaluation of Petitioner and did not offer any opinions about his mental state at the time of the offense.[11] The State emphasized this gap repeatedly in its closing argument. The prosecutor's first statement was:

> You know, ladies and gentlemen, I just want to touch on a few things that the defense brought up. You know, who are the doctors that we heard about? We heard doctors who saw him 24 years ago. 24 years ago. The one thing I will agree: Dr. Accardo. And what did he say? He said that we know that Scott McLaughlin was going to progress. There's no question. I remember him saying that. We also remember that he did progress. They all talked about that he was doing better.

(Trial Tr. 1988:15-24.) The prosecutor went on to stress that forensic psychologist Dr. Cunningham had not examined Petitioner or conducted testing:

> The only doctor they brought in to talk about anything was Dr. Cunningham.
>
> And I will say he came up with all sorts of excuses. I mean, really, he should be called Dr. Excuse. When you start looking at this

---

[11] (*See* 29.15 Hearing Tr. 590:12-592:1) (at the postconviction hearing, counsel testified that he attempted to elicit testimony from Dr. Cunningham about the statutory mitigating circumstances, but he "said he wasn't going to be able to assist us because his focus wasn't on anything that happened at the time of the crime").

man, you have to go back and say, Okay. I know he's a doctor, but how much weight should I give his testimony?

Well, first of all, you look at how many tests did he do? Not one test. He didn't evaluate him. He never gave him an IQ test. He never gave him any type of testing at all to see where he is. All he is is Dr. Excuse.

(Trial Tr. 1989: 15-19; *see also id.* 1993:13-1994:7 (pointing out that there was no evidence Petitioner had been diagnosed with bipolar disorder except for testimony from a friend of the victim, who testified that she saw Petitioner take medication for that condition, and stating that "that's not a doctor we're relying on. Obviously not. I mean, people just talk.")). The jury was aware they heard no diagnoses based on a firsthand clinical evaluation and could not consider as substantive evidence any documentary proof of mental-health diagnoses.

As a result, the defense team elicited no testimony on two statutory mitigating factors they considered applicable.[12] Mr. Kenyon testified at the Rule 29.15 hearing that he does not generally submit to the jury a specific instruction on Missouri's statutory mitigators, so as not to leave the jury with the impression that those are the only possible mitigating circumstances. (29.15 Tr. 591:6-19.) This is undoubtedly a reasonable strategic choice. Nonetheless, counsel's failure to investigate Dr. Caruso deprived the jury of testimony about the *content* of those

---

[12] Those factors were: "The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance" and "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Mo. Rev. Stat. § 565.032.3(2) & (6).

potential mitigating circumstances, which they were entitled to consider even if they received no specific instruction to do so. (*See* 29.15 Tr. 590:23-591:2; 591:20-25.) There was evidence of Petitioner's dysfunctional childhood, but there was no one to testify based on any clinical evaluation whether Petitioner was undergoing a mental health crisis at the time of the murder. *See Martin v. Barrett*, 619 S.E.2d 656, 658-59 (Ga. 2005) (state *Wiggins* claim granted on grounds that where expert retained at habeas stage was the "*only* mental health expert who examined [the petitioner] and his institutional records," his testimony was significant factor in showing a reasonable probability that psychiatric testimony would have changed the sentencing outcome) (some brackets omitted) (emphasis in original).

Second, and more importantly, *even after* Dr. Caruso informed counsel of the misconduct investigation, counsel went on to make an opening statement wherein he described Dr. Caruso's anticipated testimony in detail, mentioning him by name six times. The penalty phase only lasted four days; it is not reasonable to assume the jury had forgotten counsel's opening statement by the time it began deliberations. Indeed, the State referred to Dr. Caruso again by name when it cross-examined Dr. Cunningham. (Trial Tr. 1855:4-5.) Even if defense attorney's failure to investigate Dr. Caruso could be considered minor enough to this point to escape constitutional notice, his decision to plow forward with an unedited opening

statement would have magnified the initial error into one of constitutional proportion.

In *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Ct. App. 1991), the defendant had stabbed her husband to death. Up until trial began, the defense strategy had been to call the defendant to testify about the abuse her husband had inflicted on her and to call a treating psychologist to explain battered wife syndrome, confirm the defendant's attempts to seek help for her husband's alcohol abuse, and opine that she had not intended to kill the victim. Defense counsel emphasized these points repeatedly in his opening statement.

It appears that, during the trial, the two defense attorneys had a disagreement and one of them advised the defendant not to testify. She accepted this advice and elected not to take the stand. As a result, the defense also did not call the psychologist, reasoning that hearing from him alone would have an adverse effect because it would "heighten" the jury's desire to hear from the defendant herself.

The court held that counsel's performance had been constitutionally inadequate. The attorneys had arbitrarily broken their promises to the jury about what the evidence would show, causing the jury to lose "confidence in the credibility of the advocate's cause." *Id.* at 226. Even assuming it had been reasonable to advise the defendant not to testify because she "was a very risky witness" and "there were inconsistencies in her explanation of the events," nothing

had changed about her testimony between the adoption of the battered-woman defense and counsel's opening statement. In other words, to the extent a reasonable decision might have been made not to call the defendant to the stand, it would have to have been made in time to formulate some other defense in order to pass constitutional muster.

This is the same situation that occurred in this case. Even if counsel had not engaged in a deficient investigation, Dr. Caruso's credibility problem was "just as apparent" to Petitioner's trial counsel before his penalty-phase opening statement as it was afterward. *Id.* Like in *Zimmerman*, nothing changed between penalty-phase opening statements and counsel's subsequent decision not to call Dr. Caruso; there was "no basis for the sudden change in strategy." Counsel knew about Dr. Caruso's professional misconduct at that point and should have minimized the risk of prejudice resulting from his loss of credibility in front of a jury that "may view unsupported claims as an outright attempt at misrepresentation." *Id.* (quoting McCloskey*, Criminal Law Desk Book*, § 1506(3)(O) (Matthew Bender, 1990) and citing *State v. Moorman*, 320 N.C. 387 (N.C. 1987) (ineffective assistance based upon failure to present promised evidence)); *see also Wiggins*, 539 U.S. at 515 (at the conclusion of her penalty-phase opening statement, counsel promised jury they would hear evidence of the defendant's "difficult life" but then failed to follow through); *Robinson v. United*

*States*, 744 F. Supp. 2d 684, 692-93 (E.D. Mich. 2010) (where trial counsel failed to call the defendant to testify though "there were no evidentiary surprises at any time before or during the trial which would warrant such a change in strategy after he had promised the jurors that they would hear from [the defendant]," his performance was deficient).

The ABA Standards for the Appointment and Performance of Counsel in Death Penalty Cases (2003) do not have the force of law, but they can be instructive. *See Bobby v. Van Hook*, 558 U.S. 4, 8 (2009); *accord Missouri v. Frye*, 132 S. Ct. at 1408. Guideline 10.7(A) provides that "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." Counsel's investigation of Dr. Caruso's credentials was neither thorough nor independent. Certainly counsel must pick and choose among potentially infinite mitigating circumstances to investigate, and there are many circumstances in which it is reasonable to decide to discontinue investigation of a particular avenue. But this is not one of those circumstances; this is a situation where counsel failed to conduct an adequate investigation to support the strategy they actually presented. *See English*, 602 F.3d at 726-27; *Stevens v. McBride*, 489 F.3d 883, 896 (7th Cir. 2007); *United States ex rel. Erickson v. Shomig*, 162 F. Supp. 2d 1020, 1044 (N.D. Ill. 2001) (decision to call expert who had embellished his credentials (and then was roundly impeached on

cross-examination) could not have been strategic because "trial counsel did not verify [the expert's] credentials or interview him regarding his trial testimony and report" and "a strategic decision necessarily rests on knowledge about what a witness will say *and* the pros and cons of presenting that testimony") (emphasis added).

Although admission by an attorney that his own representation was inadequate is not "decisive," *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998), counsel's recognition of his own ineffectiveness not two days after his opening statement is further evidence that counsel's representation fell below prevailing professional norms. *See Strickland*, 466 U.S. at 689 (court should "evaluate the conduct from counsel's perspective at the time"). Petitioner's postconviction appellate counsel also testified credibly to this court that, in the more than 30 capital cases she had worked on, she had never seen an attorney promise in his penalty-phase opening statement that a particular witness would appear and then fail to deliver. (Tr. 84:7-13.). This highlights the fact that counsel's failure to investigate Dr. Caruso's credentials fell outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) (where trial court failed to call as promised a psychiatrist and a psychologist to testify about the murder defendant's mental state as he carried out a murder, "it was inexcusable to have given the matter so little

thought at the outset as to have made the opening promise" and since there was no

rule requiring counsel to mention a specific witness to preserve right to call that

witness, there had been "nothing to gain" by doing so in that case but "potential

embarrassment in case he changed his mind").

### *e.      Prejudice*

This court is charged with analyzing both *Strickland* prongs de novo.

*Dickens*, 740 F.3d at 1321-22. To show prejudice, a petitioner must demonstrate

that there is a reasonable probability that, but for counsel's professional errors, the

result of the proceeding would have been different. *Strickland*, 466 U.S. at 695. A

"reasonable probability" is one sufficient to undermine confidence in the outcome.

*Id.* In a capital case:

> the question is whether there is a reasonable probability that, absent
> the errors, the sentencer—including an appellate court, to the extent it
> independently reweighs the evidence—would have concluded that the
> balance of aggravating and mitigating circumstances did not warrant
> death.

*Id.* (judge-imposed sentence); *see also Wiggins*, 539 U.S. at 537 (if "there is a

reasonable probability that at least one juror would have struck a different balance

[when considering whether the mitigating evidence outweighs the aggravating

evidence], the death penalty cannot be imposed").

In reweighing the mitigating and aggravating circumstances in light of the

evidence now in the record, *see Wiggins*, 539 U.S. at 534, and *Sears*, 561 U.S. at

956, this court considers the testimony given by Dr. Peterson, the psychiatrist hired by the postconviction defense team.

Dr. Peterson testified that (like Dr. Cunningham) he reviewed Petitioner's school, medical, and jail records and conducted interviews of Petitioner and some family members. He testified that, in coming to his diagnoses, he relied in part on the neuropsychological assessment and battery of tests conducted by Dr. Heilbronner, the postconviction neuropsychologist, who had concluded that Petitioner's poor functioning was likely caused by a physical brain injury he had sustained.[13] But most importantly, Dr. Peterson had evaluated Petitioner face-to-face and had asked questions about Petitioner's thinking at the time of the murder and made clinical observations about his behavior. Dr. Peterson testified at the Rule 29.15 hearing that he diagnosed Petitioner with borderline personality disorder with narcissistic features and intermittent explosive disorder. (29.15 Hearing Tr., 434:3-437:15, 440:3-442.) He explained his opinion that, at the time of the murder, Petitioner was under extreme duress (Tr. 453:14-21), had reduced capacity to conform his conduct to the requirements of law because of the borderline intellectual functioning and borderline personality disorder (Tr. 453:22-454:8), and had not been taking medication that had previously helped him (Tr. 454:15-17). Dr. Peterson testified that:

---

[13] Dr. Peterson testified that his opinion as to the statutory mitigators would not have changed even if he had not reviewed Dr. Heilbronner's assessment. (29.15 Hearing Tr. 522:14-523:11.)

Persons with those kinds of difficulties he has, a lower IQ, very low frustration tolerance, impulsive activity, and borderline personality, frequently do things incredibly against their own interests without thinking about the conflicts and the consequences. I believe that's what happened with him. At that moment, he was unable to conform his conduct to law. Subsequently and obviously he tried to cover things up, but not well.

(29.15 Hearing Tr. 455:16-456:3.)

In light of Dr. Peterson's testimony, there is a reasonable probability of a different sentencing outcome had trial counsel adequately investigated Dr. Caruso before trial. Had he done so, the defense would have presented testimony from a qualified psychiatrist or other expert, such as Dr. Peterson, who had evaluated Petitioner as an adult. *Case.* That additional testimony would have been qualitatively different from what was presented: it would have comprised the only evidence from a mental-health expert bearing on Petitioner's psychological state at the time of the murder.

The defense also would not have broken its promise to the jury about what it would hear as mitigation evidence. *See Anderson*, 858 F.2d at 17 (where defense counsel promised psychiatric testimony but failed to follow through, the jurors "would believe, in the absence of some other explanation" that the promised witnesses were "unwilling" to testify and "[t]his they would not forget").

The jury rejected most of the aggravating circumstances proffered by the prosecution. Had it heard testimony from an expert that Petitioner was unable to

conform his conduct to the law at the time of the murder, it may have found that his commission of the crime, however outrageous, did not reflect "depravity of mind" and thereby found Petitioner ineligible for the death penalty. (*See* 29.15 Hearing Tr. 593:12-23) (one of counsel's two penalty-phase strategies was to create "reasonable doubt as to all of the statutory aggravating circumstances"). It also is reasonably probable the jury would have weighed the aggravating and mitigating circumstances differently. This probability is particularly acute because we do not know how many members of the jury found in favor of the defendant at that stage of the inquiry and because the jury ultimately deadlocked. Likewise, there is a reasonable probability the court would have sentenced Petitioner to life in prison without possibility of parole if it had heard evidence supporting the existence of two statutory mitigating circumstances – even if counsel still would not have submitted the instruction enumerating those statutory mitigators – because those mitigators related to Petitioner's mental state at the time of the crime. *See Griffin v. Pierce*, 622 F.3d 831, 844-45 (7th Cir. 2010) (where the same judge presides over sentencing and post-conviction hearing, his or her assessment that new evidence would not have made a difference is considered but not "conclusive"; rather, in applying the "reasonable probability" standard, habeas court must "conduct an objective evaluation of the evidence").

The jury obviously found this to be a close case, and an objective view of the evidence confirms that it was a close case. The jury rejected three statutory aggravators and ultimately deadlocked. Its weighing of the mitigating and aggravating circumstances is riddled with uncertainty. The prosecution argued that the mental-health testimony actually presented was obsolete and not relevant to Petitioner's mental status at the time of the crime. The jury was prohibited from considering medical records as substantive evidence in order to corroborate Dr. Cunningham's secondhand conclusions in some other way.[14] Considering the mitigation evidence provided by Dr. Peterson at the 29.15 hearing on balance with the relatively weak case in aggravation, confidence in the sentencing outcome is undermined by trial counsel's failure to investigate Dr. Caruso. *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694); *Strickland*, 466 U.S. at 695 (a "weakly supported" conclusion is "more likely to have been affected by errors than one with overwhelming record support"); *see also Sears v. Upton*, 561 U.S. 945, 953-56 (2010). Petitioner has demonstrated there is a reasonable probability that

---

[14] Although Petitioner's claims about the records themselves are either procedurally defaulted or otherwise without merit, at least some of the records could have been rendered admissible under a state-law hearsay exception. *See McLaughlin*, 378 S.W.3d at 352-53 (noting that Petitioner's school records were admissible); *State v. Moore*, 721 S.W.2d 141, 143 (Mo. Ct. App. 1986) (medical history necessary for diagnosis and treatment admissible under statutory hearsay exception codified at Mo. Rev. Stat. §§ 490.680); *see also State v. Graham*, 641 S.W.2d 102, 106 (Mo. banc 1982). Even if they were otherwise inadmissible hearsay, some of the records might have been admitted under *Green v. Georgia*, 442 U.S. 95 (1979).

the outcome at sentencing would have been different had trial counsel's performance been objectively reasonable.[15]

## B. Claim 1B: Failure to present neuropsychologist

Unlike Claim 1A, the state courts considered on the merits Petitioner's claim that trial counsel was ineffective for failing to present the testimony of a neuropsychologist at the penalty phase of his trial. Therefore, this court reviews

---

[15] Even if the deference required by Section 2254(d) might apply to any aspect of this claim, the state courts unreasonably applied *Strickland* and *Wiggins* when they decided, in rejecting Petitioner's failure-to-call-a-psychiatrist claim, that such testimony would have been cumulative. Dr. Peterson's testimony related to his examination of Petitioner and concerning the commission of the murder would have uniquely countered the prosecution's chief argument in closing that the defense's expert opinions were too old to be relevant.

The testimony Dr. Cunningham gave centered on Petitioner's abusive upbringing: the numerous damaging factors that enhanced the risk that Petitioner would experience functional and emotional defects throughout his life. (*See, e.g.*, Trial Tr. 1832:16-25.) He testified about Petitioner's mental health problems as an adult, but only in reference to records he had reviewed secondhand, which the trial court told the jury it could not consider as substantive evidence. (*See, e.g.*, Trial Tr. 1704:18-1705:2; 1865:14-17.)

Dr. Peterson testified, in contrast, about how Petitioner's psychological defects – particularly borderline personality disorder – contributed to his decision to murder Ms. Guenther. In other words, he provided the only evidence that the risks described by Dr. Cunningham had come to bear. This testimony "might well have influenced the jury's appraisal of [Petitioner's] moral culpability." *Wiggins*, 539 U.S. at 538; *see also Sears v. Upton*, 561 U.S. 945, 955 (2010) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."); *Shellito v. State*, 121 So.3d 445, 456 (Fla. 2013) (per curiam) (though jury heard testimony from family and saw psychological reports from defendant's childhood about abusive upbringing, psychological problems, learning disability, conduct disorder, low-to-average IQ, organic brain disorder, suicide attempt, and stays in mental diagnostic centers, and trial counsel made tactical decision not to call mental-health expert, his performance was deficient "in failing to have Shellito's mental health issues presented by an expert at trial to explain their significance and *impact on his behavior at the time of the murder*").

their decision through the doubly deferential lens of *Strickland* and Section 2254(d)(1).[16]

The Missouri Supreme Court rejected this claim on the merits. It held that defense counsel's decision not to seek out a neuropsychologist had been a reasonable strategy because they had reasonably concluded that retaining such an expert "would reveal no additional, beneficial information." *McLaughlin*, 378 S.W.3d at 342. Citing *Lyons v. State*, 39 S.W.3d 32, 37-38 (Mo. banc 2001), the court found that it had been reasonable for trial counsel to rely on advice from Dr. Cunningham and Dr. Caruso that the mental-health experts already retained were sufficient to testify regarding Petitioner's mental-health issues. Though it acknowledged that this advice had been formed before the experts knew Dr. Caruso would not be called to testify, it noted that this "does not affect the reasonableness of relying on Dr. Caruso's expert opinion as to whether additional

---

[16] Petitioner argues that deference should not apply to this claim or Claims 1C and 2 because the Missouri Supreme Court improperly "parsed" them into separate components, rather than evaluating the cumulative effect of counsel's errors. I agree that courts reviewing a counsel's representation under *Strickland* should look to that counsel's "overall performance," *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), but in order to get to this point in the analysis, a court must find that counsel committed an error of constitutional proportion. *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation."). As discussed below, it was not objectively unreasonable for the state court to find no error in failing to call a neuropsychologist, so there is no opportunity to assess this purported deficiency in light of counsel's overall performance. *Compare Porter v. McCollum*, 558 U.S. 30, 38 (2009). Nonetheless, the absence of testimony from a neuropsychologist who had *examined Petitioner* and the absence of corroborating documentary evidence in the form of medical, jail, and school records are factors making the failure to investigate Dr. Caruso and the resulting failure to present a psychiatrist more prejudicial.

expert testimony concerning Mr. McLaughlin's brain impairment was necessary."
*McLaughlin*, 378 S.W.3d at 343 n.4.

Unlike counsel's failure to investigate Dr. Caruso, there is no evidence in the record that counsel's failure to hire a neuropsychologist was a mistake. Instead, there is – as the state court noted – evidence that it was a reasoned decision based on advice from the experts counsel did hire. (*See* 29.15 Hearing Tr. 572:19-573:11.) Dr. Caruso had incentive to omit his professional misconduct from his curriculum vitae, and a minimally competent counsel would have verified his credentials rather than relying on Dr. Caruso's selective self-characterization. *See Erickson*, 162 F. Supp. 2d at 1044. But relying on the experts' opinions *within* their respective areas of professional expertise – psychiatry and psychology – is qualitatively different, and something counsel was entitled to do. *See Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007); *Worthington v. Roper*, 631 F.3d 487, 502 (8th Cir. 2011). This is especially true because Dr. Cunningham had reviewed "a substantial collection of records pertaining to [Petitioner's] social and medical history," and presumably counsel could count on him to recommend a neuropsychologist if he had seen suggestions in those records indicating one was needed. *Worthington*, 631 F.3d at 502. As Petitioner points out, it is likely those opinions would have been modified by counsel's ultimate decision not to call Dr. Caruso, but that limitation is rectified by this court's holding as to Claim 1A.

Because his counsel relied appropriately on expert advice about the extent of his investigation, Petitioner has not shown that the state court's rejection of this claim was based on an unreasonable application of *Strickland* such that counsel's failure to call a neuropsychologist was outside the acceptable "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Nor has he shown that the state high court acted "contrary to" *Strickland* by arriving at a conclusion opposite that of the United States Supreme Court on a question of law. Although the state court stated, by way of shorthand, that the selection of expert witnesses "cannot be challenged" at the postconviction stage, it is clear this statement was meant to emphasize the difficulty of overcoming the presumption that trial counsel acted effectively. *Compare Forrest v. Steele*, 764 F.3d 848, 861 (8th Cir. 2014). Elsewhere the court correctly articulated and applied *Strickland*. *McLaughlin*, 378 S.W.3d at 343 ("Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable.").

Since Petitioner has not fulfilled the *Strickland* "performance" prong, this court need not re-weigh the mitigating evidence presented at the postconviction stage along with the mitigating and aggravating evidence presented at trial to make a determination about prejudice.

### C.  Claims 1C and 2: School, medical, and jail records

Petitioner's Claim 1C and both parts of his Claim 2 are related, and I will consider them in tandem.  In Claim 1C, Petitioner argues that trial counsel was ineffective for failing to introduce as substantive evidence his school, medical, and jail records, which reflect his troubled family history, learning issues, and psychological problems.  In Claim 2, Petitioner argues the trial court violated his Eighth Amendment rights by instructing the jury not to consider those records as substantive evidence (Claim 2A) and that his defense counsel was ineffective in failing to object to these instructions (Claim 2B).

In his motion for a new trial and on direct appeal, Petitioner did not make any claim related to his school, medical, and jail records.  (*See* Resp.'s Exs. E, F.) In Missouri, claims of trial court error, including constitutional claims of trial court error, must be raised on direct appeal.  *See, e.g., Middleton v. State*, 103 S.W.3d 726, 740 (Mo. banc 2003); *Griffin v. State*, 794 S.W.2d 659, 661 (Mo. banc 1990). Because Petitioner failed to present this claim to the Missouri state courts in accordance with the state's procedural rules, his Claim 2A is procedurally defaulted and cannot be considered by this court.  *See Skillicorn v. Luebbers*, 475 F.3d 965, 976 (8th Cir. 2007); *see also* L.F. 185-86 (29.15 motion court recognized this claim had been defaulted at direct appeal stage).

Even assuming that it has properly been presented to the state courts, the corollary claim – that his counsel ought to have objected to the trial court's limiting instructions – must also be denied. *See* 28 U.S.C. § 2254(b)(2) (federal court may deny habeas petition on the merits notwithstanding petitioner's failure to exhaust state remedies). As the Missouri Supreme Court recognized (and Petitioner does not dispute), "trial counsel did not seek to introduce the records, nor did they lay the adequate foundation to admit such records." *McLaughlin*, 378 S.W.3d at 354. Without attempting to proffer the records for their truth or to prove their foundation, any objection to the trial court's limiting instructions would not have been meritorious. *Storey v. State*, 175 S.W.3d 116, 132 (Mo. banc 2005) (failure to make a non-meritorious objection not prejudicial under *Strickland*); *Martin v. Durham*, 933 S.W.2d 921, 923-24 (Mo. Ct. App. 1996) (limiting instruction appropriate when expert describes hearsay he or she relied on in reaching an opinion).

But Petitioner also argues that his trial counsel was ineffective for failing to present the records in the first place (Claim 1C). He made that claim to Missouri Supreme Court at the postconviction stage, and that court rejected it on its merits. The court held that because the records were cumulative to other evidence

presented in mitigation during the penalty phase of the trial and that they pertained to uncontested issues, Petitioner had failed to demonstrate *Strickland* prejudice.[17]

More specifically, as to the school records, the court found they showed "childhood abuse and neglect," and would only have duplicated testimony from Petitioner's biological aunt, cousin, and sister about how Petitioner had been treated and the problems he had in school. Although the "Court recognize[d] the different weight that may be afforded to documentary evidence over testimony from family members," it held that because "[t]he prosecution did not suggest that [the family members'] testimony was fabricated, and there [was] no basis to think that this additional evidence would have made a difference at trial," Petitioner had not demonstrated *Strickland* prejudice. *McLaughlin*, 378 S.W.3d at 353.

As to the jail and medical records, the Missouri Supreme Court held that:

> Just as the hospital and jail records indicate that Mr. McLaughlin was depressed, was medicated for that depression, and that he had borderline personality order [*sic*], these conditions were fully described by the testimony of Drs. Cunningham and Kulkamthorn, as well as Mr. McLaughlin's friend, Kimberly Barrett.

*Id.* It also noted that Virginia Aurich, a friend of the victim, had testified that she saw Petitioner take medication for bipolar disorder. The court stated that the

---

[17] Strictly speaking, the Missouri Supreme Court held that the 29.15 motion court had not erred in denying Petitioner's motion to hold an evidentiary hearing on this claim. In order to be entitled to a postconviction evidentiary hearing on trial counsel's competence, a movant must "allege facts, unrefuted by the record" to support the two *Strickland* prongs. *McLaughlin*, 378 S.W.3d at 352 (quoting *Webb v. State*, 334 S.W.3d 126, 128 (Mo. banc 2011)).

prosecution had not "claim[ed] that these conditions were a recent fabrication or would not be supported by the medical or jail records." *Id.* Because the records were cumulative and "because whether [he] had such a mental health history was not a central contested issue," the Missouri Supreme Court held, Petitioner "was not prejudiced by his trial counsel's failure to introduce the records into evidence."

Petitioner contends that the determinations that the evidence was cumulative and the issues undisputed were both unreasonable determinations of fact. *See* 28 U.S.C. § 2254(d)(2) (no habeas relief unless state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court). He argues that the school records could not possibly be cumulative because no teachers or school counselors testified at trial. He also states, essentially, that the jail and hospital records describing his mental-health problems were not cumulative because they were either significantly newer (than testimony from Dr. Accardo), importantly corroborative (to testimony from Dr. Cunningham), or from a more trustworthy source (than testimony from the lay witnesses, Dr. Cunningham, or Dr. Kulkamthorn).

It is true that the prosecution attacked the credibility of these other sources in closing argument.[18] But even "[a]ssuming evidence should be seen as non-

---

[18] *See* Trial Tr. 1988:17-24 (emphasizing that Dr. Accardo had seen Petitioner 24 years ago and there was "no question" Petitioner was "going to progress" and "did progress"); 1989:6-11 (stating "all [Dr. Kulkamthorn] is doing is writing prescriptions. How many times did he even

cumulative where it is significantly more credible than existing evidence," the difference between viewing [Petitioner's] medical records and learning their contents from witnesses . . . is not so great as to make the Missouri Supreme Court's finding unreasonable." *Forrest v. Steele*, 764 F.3d 848, 856-57 (8th Cir. 2014).  Where the record supports the high court's finding that the evidence would have been cumulative, so that it was not "objectively unreasonable," this habeas court must accept that finding.  Here, Petitioner does not dispute that the records would have corroborated and bolstered the testimony already given, and therefore, that they largely "encompassed" the evidence already presented.  *Bucklew v. Luebbers*, 436 F.3d 1010, 1020 (8th Cir. 2006); *see also Hall v. Luebbers,* 296 F.3d 685, 693 (8th Cir. 2002) (counsel not ineffective for failing to present cumulative evidence during guilt phase of capital trial).  Petitioner has not pointed out any specific diagnosis, course of treatment, medical event, psychological condition or symptom, or family history that the jury did not hear from some other source (except what has already been discussed about Dr. Caruso), or any other clear and convincing evidence that the records were non-cumulative.   Because he

---

see him?"); 1989:11-1991:7 (among other things, calling Dr. Cunningham "Dr. Excuse," pointing out that he "didn't evaluate" Petitioner and "never gave him any type of testing at all to see where he is," that the jury "better believe there's bias.  He's made millions of dollars doing this."); 1993:13-23 (stating "There is no evidence that [Petitioner] was bipolar" because "Do you recall the only time you saw [mention of bipolar] is when Dr. Cunningham came in, and what did the judge instruct you on?  That's not evidence."); 1994:5-7 (stating that victim's friend Ms. Aurich was "not a doctor we're relying on. Obviously not. I mean, people just talk.").

has not shown *Strickland* prejudice, I need not examine trial counsel's performance.

### D.     *Claim 3:* **Ring** *violation*

In Claim 3, McLaughlin argues that his death sentence by the judge was based on findings of fact not made by the jury, in violation of his Sixth Amendment right to a jury trial as described in *Ring v. Arizona*, 536 U.S. 584 (2002).  In a supplemental traverse, he argues that the Supreme Court's recent decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016), further supports this interpretation of *Ring's* application to his case.

The jury found one statutory aggravating factor, depravity of mind.  At sentencing the judge made comments about why he agreed with the jury's finding on this factor.  The Missouri Supreme Court rejected Petitioner's argument that these comments were additional findings prohibited by the Sixth Amendment.  The Missouri Court's determination on this part of the argument is not contrary to *Ring* and *Hurst* does not change this analysis in any way.

But from the verdict form in this case no court could determine whether the jury made the *other* factual findings required by Missouri law to render McLaughlin eligible for the death penalty, so those findings were made by the judge in violation of McLaughlin's Sixth Amendment right.  The state court's

rejection of this argument was contrary to and an unreasonable application of *Ring*

and *Mills v. Maryland*, 486 U.S. 367 (1988).[19]

### i.        *Missouri's capital sentencing statute*

When a defendant is convicted of capital murder in Missouri, sentencing is

governed by Mo. Rev. Stat. §565.030.  In relevant part, the statute provides:

> . . . . The trier shall assess and declare the punishment at life
> imprisonment without eligibility for probation, parole, or release
> except by act of the governor:
>
> (1) If the trier finds by a preponderance of the evidence that the
> defendant is intellectually disabled; or
>
> (2) If the trier does not find beyond a reasonable doubt at least one of
> the statutory aggravating circumstances set out in subsection 2 of
> section 565.032; or
>
> **(3) If the trier concludes that there is evidence in mitigation of
> punishment, including but not limited to evidence supporting the
> statutory mitigating circumstances listed in subsection 3 of section
> 565.032, which is sufficient to outweigh the evidence in
> aggravation of punishment found by the trier**; or

---

[19] Petitioner did not raise this claim properly in state court, so the Missouri Supreme Court reviewed it for plain error only.  *See McLaughlin*, 265 S.W.3d at 265-66.  Plain-error review does not resurrect an otherwise-defaulted claim, *see Clark v. Bertsch*, 780 F.3d 873, 876-77 (8th Cir. 2015), so Petitioner's failure to preserve this claim would normally preclude review by this habeas court.  However, the Supreme Court has unequivocally confirmed procedural default is an affirmative defense that must be raised by the State.  *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997).

Respondent has not raised procedural default with respect to this claim, and so this court is permitted, but not required, to consider it.  *See id.; King v. Kemna*, 266 F.3d 816, 822 (8th Cir. 2001); *see also Dansby v. Hobbs*, 766 F.3d 809, 824 (8th Cir. 2014) (if a court chooses to address procedural default sua sponte, it must give the parties fair notice and an opportunity to be heard).  Because the Missouri courts fully considered this claim on the merits and both sides have fully briefed it, this court will consider the claim on the merits under the deferential standard of review set out in the AEDPA.  *See Perruquet v. Briley,* 390 F.3d 505 (7th Cir. 2004).

(4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.

If the trier assesses and declares the punishment at death it shall, in its findings or verdict, set out in writing the aggravating circumstance or circumstances listed in subsection 2 of section 565.032 which it found beyond a reasonable doubt. If the trier is a jury it shall be instructed before the case is submitted that if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor or death. The court shall follow the same procedure as set out in this section whenever it is required to determine punishment for murder in the first degree.

(emphasis added).

### ii.      _Factual sentencing determinations_

The jury here had been provided alternate forms of verdict; it returned the verdict form indicating that it was unable to decide or agree on the punishment (the third step of the penalty decision in this case). On the form the jury filled in the answers regarding steps one and two of the sentencing findings. (L.F. 865-866). It found the aggravating factor that the murder involved depravity of mind: "That the defendant committed repeated and excessive acts of physical abuse upon [the victim] and the killing was therefore unreasonably brutal." It did not find the other aggravators on which it had been instructed, namely, that the murder was committed as part of forcible rape, or to prevent the victim from being a witness in either the

burglary prosecution or the order of protection case that McLaughlin was facing at the time of the murder. (Instruction No. 23, L.F. 856-857).

With regard to mitigating factors, the jury was asked:

Does the jury unanimously find that there are facts and circumstances in mitigation of punishment sufficient to outweigh facts and circumstances in aggravation of punishment?

It answered "No" to this question. (L.F. 866). At the later sentencing hearing, the judge stated:

The Court finds that the findings made by the jury in the second stage of the sentencing stage, in particular, the depravity of mind, by repeated and excessive acts of physical abuse encompassing beating, stabbing, and sexual intercourse on a continuous basis, and are part of the murder, the Court finds that particular aggravating circumstances and concurs with that and with the jury's findings in that regard.

The court concurs with that finding. And the Court further concurs with the jury that there's not – no substantive mitigating circumstances to outweigh the aggravating circumstances.

By mitigating circumstances, I know it's been brought up that it's not clear from the instructions as to what was considered, but certainly what was considered would be evidence that we've heard throughout the trial and certainly have considered the mental condition of Mr. McLaughlin as well as his relationship and the volatility of the relationship between him and Beverly Guenther as well as anything that would be mitigating that was brought up on his behalf, and I agree with the findings of the jury that they don't outweigh the aggravating circumstances that was found.

(Tr. Trans. 2004:5 to 2005:1).

### *iii.      Jury instructions*

The jury instructions given in this case were patterned from the third edition

of the Missouri Approved Instructions for criminal cases (MAI-CR 3d).  Missouri

courts in criminal cases are required to use the MAI-CR if they include an

instruction relevant to the case.  *See* Mo. Sup. Ct. R. 28.02(c), 28.02 (f).  The MAI-

CR are promulgated by the Missouri Supreme Court.  *Blackmon v. White*, 825 F.2d

1263, 1266 (8th Cir. 1987).

Instruction No. 24 provides that "if you have unanimously found beyond a

reasonable doubt that one or more" statutory aggravators existed, "you must then

determine whether there are facts or circumstances in mitigation of punishment

which are sufficient to outweigh facts and circumstances in aggravation of

punishment."  It continues in relevant part, "It is not necessary that all jurors agree

upon particular facts and circumstances in mitigation of punishment.  If *each juror*

determines that there are facts or circumstances in mitigation of punishment

sufficient to outweigh the evidence in aggravation of punishment, then you must

return a verdict fixing defendant's punishment at imprisonment for life by the

Department of corrections without eligibility for probation or parole."  (L.F. 858)

(emphasis added).  *See* MAI-CR 314.44.

Instruction No. 26 provides in relevant part, "If you *unanimously* decide that

the facts or circumstances in mitigation of punishment outweigh the facts and

circumstances in aggravation of punishment, then the defendant must be punished"

by imprisonment for life without parole. (L.F. 860) (emphasis added). *See* MAI-

CR 314.48.

Instruction No. 26 explained what the jury was to do if it deadlocked at

Section 565.030 step 3, the weighing of aggravating and mitigating circumstances:

> If you do unanimously find the existence of at least one
> statutory aggravating circumstance beyond a reasonable doubt, . . .
> and you are unable to unanimously find that the facts or circumstances
> in mitigation of punishment outweigh the facts and circumstances in
> aggravation of punishment, but are unable to agree upon the
> punishment, your foreperson will complete the verdict form and sign
> the verdict form stating that you are unable to decide or agree upon
> the punishment. In such case, you must answer the questions on the
> verdict form. . . . If you return a verdict indicating that you are unable
> to decide or agree upon the punishment, the Court will fix the
> defendant's punishment at death or at imprisonment for life . . . . You
> will bear in mind, however, that under the law, it is the primary duty
> and responsibility of the jury to fix the punishment.

(L.F. 861-62.)

### iv.     *Ring v. Arizona*

In *Ring* the United States Supreme Court applied its earlier decision in

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) to hold Arizona's death penalty

statute unconstitutional because the judge, not the jury, determined the presence or

absence of aggravating factors required by the Arizona statute for imposition of the

death penalty. *Apprendi* recognized that under the Sixth Amendment a defendant

could not be "exposed to a penalty exceeding the maximum he would have

received if punished according to the facts reflected in the jury verdict alone."
*Ring*, 536 U.S. at 588-89 (quoting *Apprendi,* 530 U.S. at 483). Arizona had
enacted a capital punishment statutory scheme that – like Missouri's – required a
sentencer to consider aggravating and mitigating circumstances before selecting
the death penalty. By statute, Arizona made the presence of at least one statutory
aggravating factor a prerequisite for imposition of the death penalty. It also
required the sentencer to determine that there were no mitigating circumstances
that called for leniency. Because the jury found Ring guilty only of felony murder,
the judge was required to conduct a separate evidentiary hearing to consider the
aggravating and mitigating factors and determine the sentence.

In *Ring* the Arizona statute ran afoul of the Sixth Amendment jury right
because the judge, and not a jury, made the factual findings regarding aggravation
that qualified him for the death penalty. The Court overruled the distinction
between "elements" and "sentencing considerations" that it had earlier found valid
in *Walton v. Arizona,* 497 U.S. 639 (1990) and stated: "If a State makes an
increase in a defendant's authorized punishment contingent on the finding of a fact,
that fact—no matter how the State labels it—must be found by a jury beyond a
reasonable doubt." 536 U.S. at 602. Nonetheless, the Court noted that Ring's
challenge was "tightly delineated" and that he made "no Sixth Amendment claim
with respect to mitigating circumstances." *Id.* at 597 n.4. It cited *Apprendi's*

comment that the Court had "often recognized" a distinction between facts in aggravation and facts in mitigation.

Recently, in *Hurst v. Florida*, 136 S.Ct. 616 (2016), the Supreme court held that Florida's capital sentencing scheme violated the Sixth Amendment because under the Florida law the jury merely made advisory findings and a recommendation for the death penalty, and the judge was required to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty.

## *v.     State v. Whitfield*

The Supreme Court of Missouri had occasion to apply *Ring* soon after it was handed down. In *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003), the state high court recognized that the *Ring* Court had declined to decide whether the Sixth Amendment required a jury to find mitigating factors. Addressing that question itself, the Missouri Supreme Court considered whether, under the Missouri statutory scheme, the weighing of mitigating factors was a "subjective and discretionary opinion" that could be determined by a judge or a "factual finding" on which the maximum available punishment would be predicated, and thus reserved for a jury. *Id.* at 259. The Court held that the first three steps of the then-four-step sentencing process, including the weighing of mitigating and aggravating circumstances, were not opinions but "factual findings that are prerequisites to the

trier of fact's determination that a defendant is death-eligible." 107 S.W.3d at 261.

Thus, Missouri law requires factual findings regarding mitigation, and under *Ring* a jury must make those factual findings.

In *Whitfield*, as in the instant case, the jury had convicted the defendant of first-degree murder but could not agree on punishment. It had voted 11 to 1 in favor of life imprisonment. Complying with the statute as then written, the judge undertook the four-step sentencing process and sentenced the defendant to death. At that time, it was not yet the practice in Missouri death cases to use special interrogatories on the verdict form, so it was not clear at which stage the jury had deadlocked. The Missouri Supreme Court could not know whether the jury had decided the factual issues: the presence of at least one statutory aggravator and its greater or equal weight than any mitigators.

The *Whitfield* court noted, however, that a *Ring* violation would not invalidate a death sentence if the State could prove beyond a reasonable doubt that the error had not contributed to the verdict imposed. Keeping the harmless-error standard in mind, it considered the constitutionality of the judge's factual findings at each step of the then-four-step process. First, it held that the judge could properly have determined the presence of statutory aggravators because they were prior convictions. *See Almendarez-Torres v. United States*, 523 U.S. 224 (1998). Second, it held that the second step (since repealed) – requiring a finding that

aggravating evidence warrants the death penalty – should have been committed to a jury. Allowing the judge to make the finding required to complete this step was not harmless error, despite jury instructions that partially cured this misstep and a presumption that the jury had relied on them. Third, and most importantly for the instant petition, it held that it was not harmless error to commit the weighing of mitigating circumstances to the judge. It is worth quoting the decision at length because it involved the same jury instructions and verdict directors at question here:

> In regard to step 3, the jury was instructed that if it found that aggravators warranting the imposition of death were present, "each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist." The jury was informed that if all of the jurors agreed that one or more mitigators were present that were sufficient to outweigh the factors in aggravation, then it must return a verdict of life imprisonment.

> Unlike for step 2, however, the jury was not told in regard to step 3 that it had to return a verdict of life imprisonment if it could not unanimously agree whether the mitigating facts outweighed the aggravating facts. Sec. 565.030.4; see also MAI–CR3d 313.48; *Thompson*, 85 S.W.3d at 639. **Under the instruction, if even one juror, but not all, determined "there is evidence in mitigation of punishment ... which is sufficient to outweigh the evidence in aggravation of punishment ...," the jurors would be unable to agree on punishment and, under the instructions, the jury would be deadlocked** and would return a verdict form so stating.

> Here, the jury returned a verdict stating that it was unable to agree on punishment. This Court, and any court, can only act on the record, and the record does not show that the jury deadlocked after rather than before it made the requisite finding under step 3.

107 S.W.3d at 263-64 (emphasis added).

### *vi.     Analysis of state court decision and* **Ring**

On direct appeal in the instant case, the Missouri Supreme court noted that although there was now a three-step vs. four-step procedure since *Whitfield* (as the jury was no longer to make a separate finding that the aggravating circumstances warranted the death), the portions of the statute relevant here had not changed, and in particular, if the jury deadlocked at any step, the court was required to follow the same procedure as the jury. *McLaughlin*, 265 S.W.3d at 263-264. It ultimately held that because the jury had made all the necessary *factual* findings, there was no constitutional infirmity in the judge making the ultimate determination to sentence Petitoner to death.

The Court rejected the argument that the judge made factual findings about the aggravating circumstance that were not found by the jury. It held that the sentencing judge's comments referring to acts "encompassing beating, stabbing and sexual intercourse on a continuous basis" were not findings but just his explanation for why he agreed with the jury. Because the jury had found Petitioner guilty of forcible rape, the judge's statements were not additional factual findings. This is neither an unreasonable determination of the facts nor an unreasonable application of *Ring*.

The Missouri Supreme Court's conclusion that the jury verdict showed it had made all the *other* factual findings required under the statute, however, is an unreasonable application of clearly established federal law.  In response to the second question, all the jury verdict said was that the jury had not *unanimously* determined that mitigating facts outweighed the aggravating factor.  This is merely a finding of what the jury did *not* find – it does not tell us whether the factual finding necessary under the statute was made.  It may be that eleven jurors found mitigating facts *did* outweigh aggravating factors: one person voting the other way would mean the a the finding was not unanimous, which is what the verdict form asked.

In *Mills v. Maryland,* 846 U.S.367 (1988), the Supreme Court held that Maryland's capital sentencing statute failed to comport with the Eighth and Fourteenth Amendments because, in light of the verdict directors and instructions given, it was likely jurors thought they were precluded from taking any particular mitigator into account for weighing purposes unless they unanimously agreed that mitigator existed.   846 U.S. at 370.  The Court considered a hypothetical proposed by the petitioner:  under the governing statute, eleven jurors could have found six mitigating circumstances, but if none was found unanimously, there would be nothing to weigh against any aggravating circumstances.  The death penalty would be imposed "even though eleven jurors think the death penalty wholly

inappropriate." The Supreme Court commented that "it would certainly be the height of arbitrariness to allow or require the imposition of the death penalty under the circumstances so postulated." *Id*. at 374.

The appellate court in *Mills* had agreed that the governing statute was unclear as to "what was to transpire when unanimity was lacking" as to any particular mitigator. But it applied a "saving" construction to fill the gap and instructed each juror to individually weigh the mitigating circumstances he or she found. The Supreme Court found this inappropriate because the statute and instructions as written were susceptible to two interpretations, only one of which was constitutional:

> With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds. Unless we can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, we must remand for resentencing.

> While conceding that the Court of Appeals' construction of the jury instructions and verdict form is plausible, we cannot conclude, with any degree of certainty, that the jury did not adopt petitioner's interpretation of the jury instructions and verdict form.

*Id*. at 377.

In the instant case the Supreme Court of Missouri relied on an earlier case, *State v. Zink,* 181 S.W.3d 66, 74 (Mo. banc 2005), which had rejected an argument

that the same instruction and verdict form given here had "improperly raised [defendant's] burden to obtain a unanimous jury decision that evidence in mitigation of punishment was sufficient to outweigh the evidence in aggravation." But in *Zink* the jury had sentenced the defendant to death, so there was no *Ring* issue or question about what the trier had actually found. The court here acknowledged that the statute does not reference unanimity on its face, *McLaughlin*, 265 S.W.3d at 267, nevertheless held that unanimity was required, and assumed that the jury had been unanimous in favor of death eligibility.

The Missouri Supreme Court looked to the plain language of the statute, as required by state law. *See, e.g.*, *State v. Daniel*, 103 S.W.3d 822, 826 (Mo. Ct. App. 2003). After noting that each step of the capital sentencing statute referenced "the trier," it held that "if the legislature intended a majority vote to fulfill the requirement that 'the trier concludes' that mitigating evidence outweighs aggravating evidence,' then it must also have intended a majority vote to be sufficient under the other three subdivisions of that section." *McLaughlin,* 265 S.W.3d at 267. The Court went on to note that anything less than a unanimous decision on any of the sentencing factors would mean a deadlocked jury. *Id.* at 268. It then interpreted the jury's answer to the weighing question to mean that the jury unanimously found the mitigators did not outweigh the aggravators, when in

fact we cannot know whether that is what the jury actually found. It is equally likely that the jury was deadlocked at this stage of the sentencing process.

Given the uncertainty, the jury's answer to this question shows that the death penalty in this case does not comply with the constitutional mandate described by *Ring* and applied in *Whitfield* to Missouri's statutory sentencing prerequisites. Because the question asked about unanimity for a negative proposition, it does not clear up whether it was zero or eleven jurors (or something in between) who found that the mitigating circumstances outweighed the aggravators. All we know from the special interrogatory is what they did *not* find. Under *Ring*, where death-eligibility hinges on a finding of fact under state law, that fact must be decided by the jury. Under Missouri law, the weighing of mitigating and aggravating circumstances is a finding of fact. Therefore, that weighing should have been committed to the jury. Because the judge could not have known what the jury decided, he could not have relied upon it in imposing the death penalty, and so he must have made the factual finding himself. This violates the Sixth Amendment.

Reading a unanimity requirement into § 565.030 (and unreasonably basing that reading on *Ring*) also was contrary to *Mills*. *Mills* made clear that an unconstitutional state sentencing procedure cannot be "saved" through curative instructions to the jury or a post hoc reconciliation between instruction and statute, especially where it may result in the imposition of the death penalty contrary to the

wishes of a majority of jurors. *Mills* specifically found incompatible with the Constitution a situation where eleven jurors found mitigating circumstances sufficient to outweigh the aggravating circumstances, yet the death penalty was imposed anyway. Missouri's capital sentencing statutes are not appreciably different from Maryland's, and it was objectively unreasonable for the Missouri Supreme Court to find that case inapplicable. *McLaughlin*, 265 S.W.3d at 266. Precisely like in *Mills*, here we simply do not know how the jury weighed the mitigating and aggravating circumstances attendant to the murder committed by Petitioner.

Of course, this court is bound by the state courts' interpretation of state law and that interpretation may not be questioned on habeas review. *See, e.g.*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). But in this case, it is this court's *acceptance* of that state-law interpretation that leads to the constitutional problem. Missouri Supreme Court's "saving" interpretation of §Section 565.030 as containing an implicit unanimity requirement was based on an unreasonable application of *Ring*. That curative interpretation is what led to a decision contrary to *Ring* and *Mills*: approval of the trial court's imposition of a sentence without knowledge that the predicate findings of fact had been found by the jury. This is not constitutionally sufficient. As there was no finding of fact for the judge to rely

on at sentencing, his imposition of the death penalty violated the McLaughlin's

Sixth Amendment right to trial by jury.

## E.     Claim 4: Failure to present evidence of brother's rape of victim

In his fourth ground for relief, Petitioner argues that trial counsel was

ineffective for failing to present two types of evidence about his brother Billy

McLaughlin's alleged rape of the victim: (1) testimony from three lay witnesses to

whom his brother allegedly admitted raping Ms. Guenther the night of the murder[20]

and (2) testimony from a DNA expert that would have corroborated those

incriminating statements and contradicted the testimony of the DNA expert offered

by the prosecution.  Petitioner argues that this evidence would have provided a

viable defense to the rape charge and would have rebutted the aggravating

circumstance that Petitioner committed the murder during the course of a rape.

Both parts of this ground for relief were presented to the state courts, which

denied them on the merits.  Therefore, the deferential standard codified in Section

2254(d) applies to Claim 4.

## i.     State courts reasonably applied Strickland in concluding trial counsel was not ineffective for failing to introduce hearsay about Billy McLaughlin's incriminating statements

---

[20] Petitioner presents a separate ground for relief that the trial court improperly excluded hearsay testimony from one of these witnesses, Petitioner's cousin Shawn Delgado, at the penalty phase of trial.  According to Petitioner, Ms. Delgado would have testified that Billy McLaughlin told her he had helped Petitioner dispose of Ms. Guenther's body.  (Trial Tr. 1622:16-1624:14.)  This ground for relief is discussed in Claim 12.

The Supreme Court of Missouri considered the first part of this claim at the postconviction stage and found it without merit. The Court concluded that the testimony would have been hearsay, so trial counsel was not obligated to introduce it. *See Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (counsel is not ineffective for failing to offer inadmissible evidence).

In making this determination, the Court discussed the hearsay exception for statements against penal interest, which Petitioner argues should have applied here to render admissible the testimony from the three lay witnesses. As the Court pointed out, Missouri's adoption of this exception has been limited to the minimal requirements of Fourteenth Amendment due process, as applied in *Chambers v. Mississippi*, 410 U.S. 284 (1973) (guilt phase) and *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) (penalty phase). *See State v. Blankenship*, 830 S.W.2d 1, 6 (Mo. banc 1992) (out-of-court declarations against penal interest remain inadmissible "except to the extent required by *Chambers*").

For the Constitution to require a hearsay statement to be admitted notwithstanding a state evidentiary rule to the contrary, it must meet certain criteria:  among other things, it must have been made under circumstances marked with "indicia of reliability" and, if believed, it must exonerate the defendant. *Chambers*, 410 U.S. at 298. One factor tending to show reliability is whether a statement was "made spontaneously to a close acquaintance shortly after the

murder had occurred." *Id.* The Missouri Supreme Court affirmed the motion court's finding that – among other things – Billy McLaughlin's statements lacked the requisite indicia of reliability because they were made approximately six months after the murder. It also held that, even assuming the hearsay statements were believed, they would fail to exonerate Petitioner because they implicated Billy McLaughlin in the crime but did not contradict the evidence against Petitioner.

In *Chambers*, the victim had been shot in a crowded bar. The defendant had sought to introduce out-of-court statements from a person who had confessed repeatedly to friends that he had shot the victim with his own gun. That person's confessions did not implicate the defendant whatsoever. *See id.* at 292-93.

This situation is different. None of the lay witness testimony would have exonerated Petitioner of the rape. If believed, the testimony tends (at best) to show Petitioner acted in concert with Billy McLaughlin, not that Billy McLaughlin acted alone without Petitioner. (*See* 29.15 Hearing Tr. 18:4-10, 29:3-30:23, 95:22-96:3.) As such, Petitioner has not established that out-of-court statements Billy McLaughlin made were admissible, much less that his attorneys were ineffective for failing to offer them into evidence.[21] The state courts' decision to deny relief

---

[21] Testimony from Ms. Delgado and her mother, Tammy Sinclair, did not support Petitioner's position that he did not rape Ms. Guenther. (Trial Tr. 1623:5-6; 29.15 Hearing Tr. 30:4-6.) Even if there was no question about admissibility, it was reasonable trial strategy not to call those

on this claim reflects a reasonable application of federal law as clearly established

in *Strickland*, *Chambers*, and *Green*.

### ii.      State courts reasonably applied **Strickland** *in concluding trial counsel was not ineffective for failing to call DNA expert*

The Supreme Court of Missouri also considered this part of Petitioner's

claim and found it without merit.  At trial, the prosecution had called a DNA

expert, Alan Derickson, who had explained the analysis he had conducted of the

DNA sample recovered from vaginal swabs of Ms. Guenther.  *See* 378 S.W.3d at

348.  Mr. Derickson concluded that Petitioner and Ms. Guenther could not be

excluded as contributors to the DNA mixture and that, in the Caucasian population,

only 1 in every 2.2 million individuals could be a contributor to that mixture.  He

testified that both Petitioner and Ms. Guenther were such individuals.[22]  Trial

counsel testified at the Rule 29.15 hearing that he had hired an independent

consultant to test the recovered DNA, but the consultant's tests also did not

---

witnesses.  *Winfield v. State*, 93 S.W.3d 732, 739 (Mo. banc 2002) (not ineffective assistance to fail to call a witness if "counsel believes a witness' testimony would not unequivocally support his client's position").  Further, though Petitioner's trial counsel had not contacted the third potential witness, Mr. Connor, that witness merely was present at the same conversation Billy McLaughlin allegedly had with Ms. Delgado.  His recollection did not entirely match Ms. Delgado's recollection.  (*Compare* 29.15 Hearing Tr. 92:20-22 and Trial Tr. 1623:5-6.)  It is reasonable trial strategy not to call witnesses who will contradict one another.  *See Dunn v. Wallace*, 4:12CV766 JCH, 2015 WL 331573, at *4 (E.D. Mo. Jan. 26, 2015).

[22] Mr. Derickson discovered three alleles at one of the fourteen loci he examined.  He testified at trial that he excluded the thirteenth locus when conducting a statistical analysis of the likelihood that Petitioner and Ms. Guenther were contributors.  He also testified that he had not found any evidence of any individual other than Petitioner or Ms. Guenther.  (Trial Tr. 1358:1-18.)  Mr. Derickson backed off that statement at the postconviction hearing.  (29.15 Hearing Tr. 667:23-669:4.)

exclude Petitioner as a potential contributor.  (L.F. 179; 29.15 Hearing Tr. 579:19-581:23.)  Based on the consultant's findings, trial counsel decided not to challenge the state's analysis.

At the postconviction hearing, the defense presented testimony from another DNA expert, Dr. Dean Stetler, who had reviewed Mr. Derickson's analysis and also tested DNA from Billy McLaughlin and the brothers' biological parents.  Billy McLaughlin's DNA profile had become available after Petitioner's trial (and after the Rule 29.15 motion had been filed) because Billy McLaughlin had been arrested for an unrelated sexual assault.  Dr. Stetler testified that, among other things, even once he had extracted only the male DNA from the genetic sample recovered from the victim's body, there was more than one allele present at most of the loci tested. He also concluded that Petitioner, Billy McLaughlin, and Ms. Guenther shared an unusually high number of alleles and all could have contributed to the genetic mixture recovered.[23]

The state courts rejected Petitioner's ineffective-assistance claim for several reasons.  They found Petitioner had waived the claim, at least partially, because he had not made any argument about Billy McLaughlin's DNA profile in his amended Rule 29.15 motion.  The motion court also found Dr. Stetler's analysis not scientifically credible.  Finally, the state courts found that even crediting Dr.

---

[23]  Mr. Derickson testified at the postconviction hearing that the DNA sample excluded Billy McLaughlin as a contributor because he possessed certain alleles not present in the mixture.

Stetler's testimony, it had not excluded Petitioner as a contributor to the DNA mixture recovered from the victim's body. As such, it was not beneficial to his position, and counsel had not been ineffective for failing to elicit it.

Putting aside Petitioner's waiver of this claim, the Missouri Supreme Court's decision was not contrary to or an unreasonable application of *Strickland*, and it did not rest on an unreasonable finding of fact. It was not objectively unreasonable for counsel to fail to ask the independent DNA consultant to compare Billy McLaughlin's DNA to the sample recovered from the victim because Billy McLaughlin's DNA was not available at that time.[24] It was not objectively unreasonable for counsel to fail to ask the consultant to estimate the probability that Billy McLaughlin's DNA was consistent with the sample because it would not have exculpated Petitioner. *See Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir. 1994) (counsel not ineffective for failing to introduce non-exculpatory evidence). Indeed, even Dr. Stetler's testimony did not exculpate Petitioner because it did not eliminate the probability that Petitioner's DNA was part of the recovered genetic material found inside Ms. Guenther's body. Trial counsel acted reasonably in relying on the DNA testing conducted by the independent consultant and not following up with that consultant. *See Marcrum*, 509 F.3d at 511; *Worthington v. Roper*, 631 F.3d at 502. This claim does not merit relief.

_____

[24] Billy McLaughlin asserted his Fifth Amendment privilege against self-incrimination at trial (Trial Tr. 1374:14 – 1376:8).

**_F. Claim 5: Trial court did not improperly admit as aggravating evidence out-of-court statements made by the victim_**

Petitioner claims that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the court's admission of evidence of the victim's statements to law enforcement about Petitioner's threatening and assaultive actions toward her. He alleges that the statements should have been excluded under _Crawford v. Washington_, 541 U.S. 36 (2004). The Missouri Supreme Court rejected this claim on the merits, concluding essentially that _Crawford_ had been limited by _Giles v. California_, 554 U.S. 353 (2008), and the trial court's decision to admit the evidence was in line with _Giles._

In _Crawford_, the Court held that prior "testimonial" statements from witnesses who have since become unavailable must have been subject to cross-examination, or their admission violates the Confrontation Clause. What makes a statement testimonial has not been "comprehensively defined" by the Supreme Court. _United States v. Wright_, 536 F.3d 819, 823 (8th Cir. 2008). However, even a testimonial statement is admissible if it falls under the "forfeiture by wrongdoing" exception. Under that exception, a testimonial statement can be admitted notwithstanding the Confrontation Clause if the defendant engaged in conduct designed to prevent the speaker from testifying. _Giles_, 554 U.S. at 359.

In _Giles_, a criminal defendant had been convicted of murdering his former girlfriend to prevent her from cheating on him. He argued that the court should

have excluded evidence of statements the victim had made to police about his threats of violence. *Giles* resulted in a fragmented opinion. First, a six-justice majority held that the prosecution had not proved the defendant had killed his former girlfriend for the purpose of preventing her from testifying, so the admission of the statements might have violated his constitutional right to confront hostile witnesses. The Court remanded and allowed that, if the state court determined the defendant had murdered his former girlfriend for some other reason than preventing her testimony, it might have been error for the trial court to admit the statements.

However, the Court went on to describe the kind of evidence the state court should consider in making that determination. Holding that the domestic-violence context of the crime was "relevant" in determining whether otherwise inadmissible evidence could be admitted under the wrongdoing-by-forfeiture exception, Justice Scalia (still writing for six justices) held that:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.* at 377; *see also id.* at 379 (Souter, J., writing for himself and Ginsberg, J., concurring); *see also id.* at 405 (Breyer, J., dissenting, writing for himself, Stevens, and Kennedy, JJ.). Taking the *Giles* opinions in tandem, it is clear that at least seven justices agreed that a state court should – at the very least – consider evidence of an intimate abusive relationship between murderer and murder victim in considering whether out-of-court statements by that victim should be admitted under the forfeiture-by-wrongdoing exception.

Petitioner argues that, under Supreme Court precedent, the victim's statements should necessarily have been excluded because they were testimonial, but that is a misreading of *Crawford* and *Giles*. Although Petitioner is correct that the *Giles* majority explicitly "declined to adopt a blanket exception to *Crawford* for domestic violence cases resulting in murder," it reaffirmed that the wrongdoing-by-forfeiture exception can apply *even to* testimonial statements. The key question in determining admissibility of hearsay evidence of Ms. Guenther's statements, therefore, was not whether they were testimonial, but whether Petitioner had killed her to prevent her from testifying against him.

Faced with this question, the trial court found that the statements were admissible because Petitioner had killed Ms. Guenther to prevent her from testifying against him in ongoing burglary and abuse cases. *McLaughlin*, 265 S.W.3d at 272. In light of *Giles*, the court was entitled to consider, among other

things, "ongoing criminal proceedings at which the victim would have been expected to testify" in deciding whether the victim's hearsay statements were admissible under the wrongdoing-by-forfeiture exception. Therefore, the Missouri Supreme Court did not unreasonably apply *Crawford* when it affirmed that admissibility determination by the trial court.

That the jury ultimately disagreed with the trial court about Petitioner's purpose for murdering Ms. Guenther does not mean the trial court's evidentiary ruling was improper.[25] The jury rejected two statutory aggravating circumstances proffered by the prosecution related to Petitioner's motive for the murder: that it was committed for the purpose of preventing the victim from testifying in the pending burglary and domestic abuse investigations and prosecutions. Petitioner argues the Missouri Supreme Court's failure to take the jury's findings into account means that its decision rests on an unreasonable determination of fact in violation of Section 2254(d)(2). But admissibility of evidence does not – and logically could not – turn on the jury's ultimate acceptance of that evidence. The Missouri Supreme Court's decision was based on a reasonable determination of facts, and this claim will be denied.

---

[25] Moreover, the trial court standard for determining admissibility was "clear and convincing," whereas the jury was required to find the aggravating factors "beyond a reasonable doubt." *See McLaughlin*, 265 S.W.3d at 272; L.F. 858.

## G.    Claim 6: Prosecutor's penalty-phase closing argument

In this ground for relief, Petitioner argues that certain statements made by the prosecutor in penalty-phase closing argument were improper.  Petitioner claims these statements were so inappropriate that they infected the trial with unfairness, and the resulting death sentence violated his Eighth and Fourteenth Amendment rights.  *See Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  He argues that his trial counsel was ineffective for failing to object to the argument, thereby failing to preserve it as an issue for appeal.

Petitioner identifies three problematic portions of the prosecutor's argument. First, in the "soldier" portion, the prosecutor stated:

> You know, sometimes when you come in, you have a duty. You've all seen this.  You've all seen the soldiers in World War II. You know, they're now what?  In their 70s and 80s, if they're still around.

> They went back in World War II, and they did their duty.  The war wasn't something I'm sure they took pleasure in.  They didn't want to do that.  They didn't want to get taken away from their families and go over and fight the Germans and the Nazis.  That wasn't what they wanted to do; they had a duty to do it, and they did their duty.  And just as you have a duty to do . . . .

> When you talk to those men now, and you look at those men, you know what?  They're able to stand up there tall, and they're proud.  They're not proud because of what they had to do to those other young men, but they're proud because they're able to do their duty.  They did what was right even though it was hard to do that.

(Trial Tr. 1994-95.)  Second, the prosecutor stated that:

> So, ladies and gentlemen, you've heard all the evidence. You've heard both the aggravating and the mitigating. It's up to you to decide. In doing that, if you're trying to think why should you do this, well, number one, the evidence is there for you to do it. And, number two, you know, you could send a message. Even if it only stops one other person from doing what he did, that's a message you want to send.

(*Id.* 1995.) Third, the prosecutor referred to Petitioner's mitigating evidence as "excuses" and labeled forensic psychologist Dr. Cunningham "Dr. Excuse." (*Id.* 1989.)

When trial counsel does not object to a closing argument, federal habeas relief is only available "if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial." *Kennedy v. Kemna*, 666 F.3d 472, 481 (8th Cir. 2012) (quoting *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999)); *see also Copeland*, 232 F.3d 969, 974 n.2 (8th Cir. 2000) (the same test applies to guilt- and penalty-phase arguments, but "if there is any distinction between guilt and penalty phase arguments, it would seem that there should be a more searching review of the penalty phase"). Here, Petitioner's trial counsel objected to three other statements but did not object to those at issue in this claim. Petitioner argues that, together, the prosecutor's statements represent "repeated acts of misconduct" that betray a "calculated strategy by the prosecution to distract the jury from following the law." (Pet., p. 38.)

### i. "Soldier" language

The Missouri Supreme Court rejected the "soldier" claim on direct appeal. The Court distinguished the prosecutor's remarks from more "extensive, direct, graphic" arguments in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985)*, vacated on other grounds* 478 U.S. 1016 *(1986),* and *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006). The Court reasoned that the prosecutor in this case had not told the jury it had a duty to kill, just that it had a duty to "hear the evidence and decide on a punishment." The prosecutor had concluded his argument by stating, "It's up to you to decide," which was different from *Brooks* and *Weaver*. Additionally, the court's instructions to the jury had "focused the jury's attention on the individualized facts and circumstances of the case and also repeatedly reminded the jury that it was the jury's job to decide the punishment." 265 S.W.3d at 276.

Petitioner contends the Missouri Supreme Court's decision ran afoul of clearly established federal law because the prosecutor's argument was "nearly identical" to one found to violate a criminal defendant's due process rights in *Viereck v. United States*, 318 U.S. 236 (1943).[26] *Viereck* involved a German national convicted of willfully concealing activities that should have been listed on a government-required form registering himself as an agent of a foreign power. His case went to trial a few weeks after Pearl Harbor. The prosecutor reminded

---

[26] Strictly speaking, the Court vacated Viereck's conviction on an unrelated ground, and its comments related to the prosecutor's argument were dicta.

jurors the country was at war and told them they should find Viereck guilty because, among other things, there were people out there "plotting your death and my death; plotting our death and the death of our families," and the American people were relying on the jury to protect them against "this sort of a crime," just as much as they relied on the military. He went on, "As a representative of your Government I am calling upon every one of you to do your duty." *Id.* at 247 n.3.

The *Viereck* argument is different in a number of ways than the one at issue here. The prosecutor in that case implied that the defendant was a danger to the jurors themselves, used his position of authority to virtually command a conviction, and emphasized that the whole country was relying on the jurors to protect them in "a fight to the death." *Id.*; *see also Weaver*, 438 F.3d at 841 (using the conscience of the community as a guiding principle places too high a burden on a single defendant). The argument here did none of those things, nor did it explicitly encourage the jury to consider the defendant a part of some greater adversary in deciding whether to impose the death penalty. *Compare United States v. Young*, 470 U.S. 1, 16-18 (1985) (prosecutor's admonition to jury to "do its job" was improper but, even considered in concert with other improper remarks, had not "undermine[d] the fundamental fairness of the trial."); *Weaver*, 438 F.3d at 841 (it was improper for prosecutor to imply that execution of the defendant would further society's greater "war on drugs").

## ii.      *"Send a message" and "excuses" language*

Respondent disputes that Petitioner "fairly presented" to the state court his arguments related to the other inappropriate statements made by the prosecutor in closing arguments.  *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (to comply with 28 U.S.C. § 2254(b)(1), requiring exhaustion of state remedies before habeas review, petitioner must "fairly present" his claim in each appropriate state court).  A fairly presented claim rests on the same "factual arguments and legal theories" as proffered in state court and does not "present significant additional facts."  *See Kenley v. Armontrout*, 937 F.2d 1298, 1302-03 (8th Cir. 1991) (citing *Tippitt v. Lockhart*, 903 F.2d 552, 554 (8th Cir. 1990) and *Stranghoener v. Black*, 720 F.2d 1005, 1007-08 (8th Cir. 1983)).

In his state-court appeals, Petitioner argued that prosecutorial misconduct during closing argument violated his Fourteenth Amendment right to due process but did not quote the "sending a message" and "excuses" language, only the "soldier" remark.  He argues these claims were nonetheless fairly presented because there is an "arguable factual commonality" between what he said in state court and what he says here.  *Id.*

I disagree.  Petitioner relies on "significant additional facts" in basing these claims on language he did not bring to the attention of the state courts.  I cannot conclude that the state court had an opportunity to "pass upon and correct" these

alleged constitutional violations. *Baldwin*, 541 U.S. at 29 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)); *see Brown v. Luebbers*, 344 F.3d 770, 782 (8th Cir. 2003), *overturned on other grounds*, 371 F.3d 458 (8th Cir. 2004) (en banc) (where defendant raised claim in state court that one prosecutorial remark improperly shifted burden of proof, but argued to habeas court that two remarks together shifted burden of proof, habeas claim was procedurally barred).

Even assuming Petitioner's claims were reviewable by this court, the prosecutor's statements were not so inflammatory and outrageous as to require the *sua sponte* declaration of a mistrial, even when considered together. *See* 28 U.S.C. § 2254(b)(2) (federal court may deny habeas petition on the merits notwithstanding petitioner's failure to exhaust state remedies). To determine whether a prosecutorial remark infected a defendant's trial with unfairness, a court must first determine whether the remark was improper. *Simmons v. Bowersox*, 235 F.3d 1124, 1137 (8th Cir. 2001). Then, the court must:

> (1) measure the type of prejudice that arose from the argument;
> (2) examine what defense counsel did in rebuttal to minimize prejudice;
> (3) review jury instructions to see if the jury was properly instructed; and
> (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all of the aggravating and mitigating circumstances.

*Antwine v. Delo*, 54 F.3d 1357, 1363 (8th Cir. 1995) (citing *Newlon v. Armontrout*, 885 F.2d 1328, 1337 n.10 (8th Cir. 1989)). The Eighth Circuit has held that a

"sending a signal" remark "puts an improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment." *Weaver*, 438 F.3d at 841.

Applying the *Antwine* considerations to both remarks, the "message" remark was the last thing the jury heard; defense counsel could not rebut the remarks and did not object when they were made. However, the "excuses" statement and the "sending a message" statement together comprised a small portion of the overall argument. The jury had been instructed that arguments were not evidence and had been reminded several times when defense counsel objected during closing argument to what he considered mischaracterizations of evidence. (*See* L.F. 863 (Instruction No. 27); Trial Tr. 1991:2-3, 1992:10-12, 1993:3-4.))

Importantly, taking the argument as a whole, the prosecutor was clear that the chief reason the jury should impose the death penalty was that the evidence in this individual case supported that punishment. In suggesting the jury "send a message" to other potential violent offenders, the prosecutor appears to have been emphasizing one reason our society has the death penalty as punishment and why that punishment was appropriate for this case. The prosecutor's statement, when taken in context, did not encourage the jurors to abdicate their responsibility to particularize sentencing to Petitioner. Unlike the prosecutor in *Weaver*, here the

state did not prey on the jury's general fear of crime.  *Compare Weaver*, 438 F.3d

at 841-42 (citing *Copeland v. Washington*, 232 F.3d 969, 972-73 (8th Cir. 2000)).

Similarly, referring to "Dr. Excuse" and calling mitigating evidence

"excuses" was not advisable.  *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931,

995 (9th Cir. 2007).  Nonetheless, this remark was not so improper to infect the

trial with unfairness.  *Darden*, 477 U.S. at 181; *see also Malicoat v. Mullin*, 426

F.3d 1241, 1257 (10th Cir. 2005) ("excuses" language was a proper argument

"regarding the appropriate weight to afford the mitigating factors"); *United States*

*v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007) (prosecutor's argument that jury

give "no weight" to defendant's lack of a criminal record was not improper

because it did not suggest the jury exclude the factor from consideration).

Considering these two isolated remarks in the context of the argument as a whole,

the proper and repeated jury instructions, and defense counsel's extensive

discussion of Dr. Cunningham's testimony, there is not a reasonable probability

that the outcome would have been different had the remarks not been made.

Because the underlying claim has no merit, its corollary ineffective

assistance of counsel claim must also be denied.  *See Gray v. Bowersox*, 281 F.3d

749, 756 n.3 (8th Cir. 2002); *see also* 28 U.S.C. § 2254(b)(2).

## H.    Claim 7: Beck v. Alabama claim

Petitioner argues that the trial court erred in refusing to submit to the jury an instruction on second-degree felony murder.  He contends that the failure to give the jury the option of convicting him of a lesser-included offense violated *Beck v. Alabama*, 447 U.S. 625 (1980).

The *Beck* Court examined an Alabama statute that prohibited instructions on lesser-included offenses in death-penalty cases.  The Court concluded that the statute violated the Eighth Amendment; in a death-penalty case, the jury must be instructed on a lesser-included offense supported by the evidence in order to give the jury a third option between outright acquittal and conviction of a capital offense.  *Id*. at 637-38.

The Supreme Court of Missouri adjudicated Petitioner's *Beck* claim on the merits.  It agreed with Petitioner that the evidence presented would have supported an instruction on felony murder.  *McLaughlin*, 265 S.W.3d at 271; *see also* Mo. Rev. Stat. § 565.021.1(2) (statutory definition of felony murder).  But it held that because the jury here had been instructed on conventional second-degree murder, there was no danger of the "all-or-nothing" problem inherent in *Beck*, and so the Eighth Amendment did not require a felony-murder instruction.

The court did not unreasonably apply *Beck* in so holding.  Since *Beck*, the United States Supreme Court decided another case involving this issue.  In *Schad*

*v. Arizona*, 501 U.S. 624 (1991), the habeas petitioner had been convicted of capital murder.  He argued that, under *Beck*, he had been entitled to a jury instruction on the lesser-included offense of robbery.  A divided Court held that the "central concern of *Beck* simply [was] not implicated" because the *Schad* jury had been instructed on second-degree murder.

Relying on *Spaziano v. Florida*, 468 U.S. 447 (1984), *overruled on other grounds by Hurst v. Florida,*136 S.Ct. 616 (2016), Petitioner argues that the trial court did not dispose of its constitutional duty by instructing on *one* lesser-included offense.  Petitioner argues that *Spaziano* applied *Beck* to a situation involving multiple lesser-included offenses, and so both instructions should have been given here.  At worst, Petitioner argues, *Spaziano* clearly established that he should have been given a choice about whether he wanted an instruction on conventional second-degree murder or felony murder.

I disagree.  *Spaziano* did not hold that a defendant is constitutionally entitled to choose among multiple lesser-included offenses.  Instead, it held that *Beck* did not require instruction on lesser-included offenses if the statutes of limitation on those offenses had already run.  In other words, *Spaziano* is not an extension of *Beck* but a limitation thereof, providing for a situation where it is constitutional for a jury not to be instructed on lesser-included offenses at all.

Again, the standard here is whether the Missouri Supreme Court's rejection of this claim was an unreasonable application of or contrary to clearly established federal law. In light of *Schad*, as well as the deference owed to the state court decision, the Missouri Supreme Court did not unreasonably apply *Beck* when it held that the Eighth Amendment did not require the trial court to submit to the jury an instruction on felony murder. *See also Driscoll v. Delo*, 71 F.3d 701, 714 (8th Cir. 1995) (in a capital case, petitioner's trial counsel had not been constitutionally ineffective for failing to request felony-murder instruction where jury had been instructed on conventional second-degree murder); *Kilgore v. Bowersox*, 124 F.3d 985, 995 (8th Cir 1997) (same, noting that "a crime which carried a drastically lesser sentence would leave the jury with something dangerously close to the all-or-nothing choice prohibited by *Beck*" but conventional second-degree murder was a "reasonable second option"); *Spaziano*, 468 U.S. at 455 ("The goal of the *Beck* rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."); *Six v. Delo*, 885 F. Supp. 1265, 1275 (E.D. Mo. 1995).

## I. Claim 8: "Depravity of mind" statutory aggravator

Petitioner argues that the sole statutory aggravating circumstance found by the jury, that the murder of Ms. Guenther had involved "depravity of mind," is unconstitutionally vague and overbroad. He contends that, in violation of the

Eighth and Fourteenth Amendments, the instruction on depravity of mind failed to provide meaningful guidance to the jury for distinguishing between the few murders for which the death penalty is appropriate and the many for which it is not. *See Furman v. Georgia*, 408 U.S. 238, 310 (1972); *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

Responding to *Godfrey*, the Supreme Court of Missouri held in 1984 that instructing the jury that it should find depravity of mind anytime a murder was "wantonly vile, horrible, and inhuman," without more, was unconstitutionally vague. *See State v. Preston*, 673 S.W.2d 1 (Mo. banc 1984); *see also Godfrey*, 446 U.S. at 428-29 ("There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence."). The *Preston* Court set out a list of concrete circumstances on which a jury could be instructed that, in its view, would appropriately limit the depravity-of-mind aggravator. *Id.* at 11; *see also State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988) (at least one *Preston* factor must be present for depravity-of-mind aggravator to be supported by the evidence). One of the *Preston* factors was "brutality of [the] defendant's conduct," which the Court subsequently defined as involving "serious physical abuse." *Griffin*, 756 S.W.2d at 490. Though it did not elaborate on serious physical abuse, the Missouri Supreme Court did state in *Griffin* that

evidence of beating or numerous wounds would support the depravity-of-mind aggravating circumstance.

The language of the jury instruction given in this case reflects *Griffin* and *Preston*, though the wording is slightly different:

> Whether the murder of Ms. Guenther involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:
> That the defendant committed repeated and excessive acts of physical abuse upon Ms. Guenther and the killing was therefore unreasonably brutal.

(L.F. 856.)

Petitioner argues specifically that the phrase "repeated and excessive acts of physical abuse" was insufficient to comply with *Godfrey* and its progeny and thereby constitutionally narrow the pool of capital-eligible murders. He points out that "repeated" would apply to any homicide other than one committed with a single act of force, such as a single gunshot. "Excessive," according to Petitioner, is vague because the jury did not know whether it should consider or ignore those acts committed in furtherance of the murder or just other acts of physical abuse.

The Supreme Court of Missouri rejected this claim on the merits. Missouri law charges the state's high court with conducting an independent proportionality review. Mo. Rev. Stat. § 565.035.3. One of the determinations it is required to make as part of that review is whether the evidence supports any statutory

aggravating circumstance. Here, the court agreed with the jury that the crime had involved "depravity of mind" because of the "repeated and excessive acts of physical abuse" committed by Petitioner. It described the terrible defensive wounds the victim had sustained. Relying on this evidence, the court found not only that the "depravity of mind" statutory aggravating circumstance existed in this case but also that that aggravator, as narrowed by the "repeated and excessive acts" language, was not constitutionally vague. *See McLaughlin*, 265 S.W.3d at 277-78; *see also id.* 277 n.14 ("Stalking a woman, and later raping her and stabbing her seven times as she fights for her life constitutes repeated and excessive brutality under any definition of the term").

This is not contrary to or an unreasonable application of *Godfrey*. The *Godfrey* Court held that, to comply with the Eighth and Fourteenth Amendments, a state "must channel the sentencer's discretion by clear and objective standards, that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." 446 U.S. at 428 (internal quotation marks omitted). It was not objectively unreasonable for the state courts to hold that "repeated" and "excessive" meet these criteria. Although "repeated," standing alone, might not sufficiently narrow the pool of crimes for which the death penalty is constitutionally imposed, *see Furman v. Georgia*, 408 U.S. 238 (1972), it must be considered in light of the jury instruction in its totality. "Repeated and

excessive acts of physical abuse" is a readily understandable phrase, and one clearly supported by the evidence in this case. As a whole, it was not unreasonable for the state courts to conclude that the "depravity of mind" statutory aggravating circumstance was defined by clear and objective language that the sentencers understood would limit their discretion to impose the death penalty. *See also Maynard v. Cartwright*, 486 U.S. 356, 264 (1988) (applying *Godfrey* and holding that a depravity-of-mind aggravator would be "constitutionally acceptable" if it were subject to an instruction limiting it to murders involving "some kind of torture or physical abuse"); *Mallett v. Bowersox*, 160 F.3d 456, 462 (8th Cir. 1998).

## J. *Claim 9: Victim impact evidence*

In his Claim 9, Petitioner argues that the trial court erred in allowing the prosecutor to elicit testimony from the victim's son about the tragic deaths of his toddler brother and his grandfather when he was a child. Ms. Guenther's son testified among other things that those deaths had devastated his mother and had contributed to his parents' subsequent divorce. It is undisputed that those deaths occurred many years before Ms. Guenther was murdered and long before she entered a relationship with Petitioner.

Petitioner argues that the testimony was irrelevant to "the specific harm caused by the crime in question," *Payne v. Tennessee*, 501 U.S. 808, 825 (1991),

and its admission – over defense counsel's objection – rendered his sentencing fundamentally unfair in violation of his Fourteenth Amendment due process rights. *See Darden*, 477 U.S. at 179-183.  Petitioner contends that the testimony and argument inflamed the passion of the jury and created an unreasonable risk that a death sentence would be imposed based on "caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).  Under Supreme Court precedent, he argues, victim impact evidence is admissible at the sentencing phase of a capital trial but only to further the traditional purposes of sentencing and not to evoke sympathy for the victim or her family based on events totally unrelated to the victim's murder.

The Supreme Court of Missouri considered this claim on the merits and held that although "it would have been preferable not to admit the evidence," Petitioner had not demonstrated that the evidence was "so unduly prejudicial that it rendered the trial fundamentally unfair." *McLaughlin*, 265 S.W.3d at 273.  Quoting its own precedents, the Missouri Supreme Court reasoned that "[i]t is not necessary that every piece of victim impact evidence relate to the direct impact of the victim's death on the witness." *Id.* (quoting *State v. Forrest*, 183 S.W.3d 218, 225 (Mo. banc 2006), *cert. denied* 549 U.S. 840 (2006)).

The Missouri Supreme Court's decision was not contrary to or based on an unreasonable application of *Payne*.  The *Payne* Court stated that victim impact

evidence is not offered "to encourage comparative judgments" between more and less "deserv[ing]" victims, but "designed to show . . . *each* victim's uniqueness as an individual human being." 501 U.S. at 823 (internal quotation marks omitted). The Court noted that, following *Payne*, state prosecutors would no longer be barred under the Eighth Amendment from "offering a 'quick glimpse of the life' which a defendant 'chose to extinguish.'" *Id.* (quoting *Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, J., dissenting)). The testimony from the victim's son arguably represented a "glimpse of the life" of the victim. Although it is undisputed that the deaths of the Ms. Guenther's son and father were unrelated to her murder, neither *Payne* nor any other Supreme Court case precludes wholesale the admission of *any* testimony about the victim not directly related to the crime in question.

The question is then whether this evidence, unrelated as it is to the murder, was so unduly prejudicial as to render the trial fundamentally unfair. *Payne*, 501 U.S. at 825; *see also Storey v. Roper*, 603 F.3d 507, 529 (8th Cir. 2010) ("The 'fundamentally unfair' due process standard typically means that the petitioner must show that there is a reasonable probability that the alleged error affected the outcome of the trial and that absent the impropriety, the verdict likely would have been different." (citing *Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007)).

The Missouri Supreme Court found that Petitioner had not demonstrated undue prejudice because all he could cite was the jury's inability to agree on a verdict, and "there [was] nothing to connect the jury's deadlock to the admission of this peripheral testimony." *McLaughlin*, 265 S.W.3d at 273. This may be true, but it is not the appropriate way to measure whether the improper admission of evidence rendered a trial fundamentally unfair. If a defendant were required to affirmatively connect a jury's verdict to a particular piece of evidence, the Due Process Clause would be virtually meaningless: neither criminal defendants nor the courts are privy to jury deliberations and so neither can say with absolute certainty how a jury came to a conclusion.

Instead, a court must consider – based on the totality of evidence admitted at trial and the nature of that evidence – the *risk* that improper evidence led to the jury's verdict. *E.g., Estelle v. Williams*, 425 U.S. 501, 504 (1976) ("The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. . . . Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.") Although a direct connection between a piece of evidence and a verdict can be a factor in assessing this risk, such as when the jury responds to special interrogatories, it cannot be the only factor.

But even assuming it had applied the correct standard and reached the same conclusion, the state court's decision could not be considered "objectively unreasonable." The improper testimony from the victim's son must be taken in context with the rest of his proper testimony and the fact that the prosecutor did not mention the deaths in his closing argument.[27] *See Gray v. Bowersox*, 281 F.3d 749, 755 (8th Cir. 2002). Neither the victim's son nor the prosecutor stated or implied that Petitioner was somehow responsible for those deaths or that the jury should consider them when imposing a sentence, and the risk that this testimony influenced the decision is small. *See Storey*, 603 F.3d at 518-21 (in light of the other properly admitted victim impact evidence and the "grisly nature" of the crime, even obviously prejudicial evidence had not rendered trial fundamentally unfair).

The state courts' decision was not contrary to or an unreasonable application of any of the other Supreme Court due process cases cited by Petitioner, none of which speak directly to the effect of improper victim impact evidence. Claim 9 will be denied.

---

[27] Petitioner argues that the prosecutor referred to the death of the victim's young son in closing argument, but he is incorrect. The victim had three sons. The victim's son Corey had died as a toddler. (Trial Tr. 1495:3-20.) Her son Christopher testified that his remaining living brother, Nick, was "pretty shook up" and could not testify because he "[could]n't even take it." (Trial Tr. 1504:9-14.) The prosecutor stated, "Nick, the baby in the family, as Chris said, couldn't even come in." (*Id.* 1963:3-4.) He did not refer to the deceased child, Corey, during his argument.

### K.     Claim 10: Forcible rape conviction

In his Claim 10, Petitioner argues that the evidence of forcible rape was legally insufficient to support his conviction.  The governing statute provides that "[a] person commits the crime of forcible rape if such person has sexual intercourse with another person by the use of forcible compulsion. . . ." Mo. Rev. Stat. § 566.030.1.  It defines "forcible compulsion" as "physical force that overcomes reasonable resistance" or "a threat, express or implied, that places a person in reasonable fear of death, serious physical injury or kidnapping of such person or another person." *Id.* § 566.061(12).

Petitioner contends that the statue required the state to prove that Ms. Gunther was still alive when he had sexual intercourse with her.  The statute is silent on whether a live victim is required, but Petitioner argues that its terms "person," "forcible compulsion," and "reasonable resistance" are inconsistent with a victim being dead at the time of sexual intercourse.

In support of his contention that there is not enough evidence for a reasonable jury to have found beyond a reasonable doubt that he had forcibly raped Ms. Guenther while she was alive, Petitioner points to two things: (1) although the jury convicted him of forcible rape, it acquitted him of Count IV, armed criminal

action for the rape,[28] and (2) the jury sent a note to the trial court asking, "Is it rape if a person has sexual intercourse with a person who is deceased, by law?" (L.F. 840.) The court told the jury it was not permitted to respond to the question and reminded the jury to be guided by the evidence and instructions. (*Id.* 841.) As a corollary, Petitioner claims the trial court erred by refusing his proffered instruction that forcible rape requires the victim to be alive.

The Supreme Court of Missouri adjudicated this claim on the merits. It held that "where the forcible compulsion that leads to the rape begins before the death of the victim, the defendant is guilty of rape even if the jury believes defendant killed the victim before penetration or before the sexual assault was concluded." In so doing, it noted that it was adopting the "ongoing criminal assault" rule, which had been accepted by the majority of jurisdictions to examine the issue. It therefore held that it had not been error for the trial court to refuse to instruct the jury that the crime of forcible rape requires the victim to be alive throughout the assault. *McLaughlin*, 265 S.W.3d at 268-70.

Aware of the deferential standard this habeas court must apply, Petitioner argues that the Missouri Supreme Court based its decision on an unreasonable

---

[28] The Count IV instruction told the jury that if it found Petitioner had committed forcible rape and had "knowingly committed that offense by or with or through the use or assistance or aid of a dangerous instrument," it should find him guilty of Count IV. (L.F. 832.) The prosecutor had argued that the knife used by the Petitioner was a dangerous instrument he had used to aid in the forcible rape. (*E.g.*, Trial Tr. 1991:10-22.) Petitioner contends that the jury's acquittal on Count IV shows it rejected this theory.

application of Supreme Court due process cases. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (Fourteenth Amendment protects criminal defendant against conviction unless any rational trier of fact could have found every essential element of the charged offense beyond reasonable doubt); *see also In re Winship*, 397 U.S. 358, 364 (1970) (this is a federal constitutional claim cognizable on habeas review); *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000) (Sixth Amendment also protects defendant's right to have a jury make this determination). Petitioner argues that the Missouri Supreme Court's decision is also based on an unreasonable determination of the facts before the state courts because it failed to consider the jury's supposed rejection of the prosecution's theory that Petitioner's stabbing of Ms. Guenther fulfilled the "forcible compulsion" element of forcible rape.

### i. *State court decision was based on reasonable interpretation of law*

The Missouri Supreme Court's decision that, under Missouri law, forcible rape does not require the victim to be alive at the time of penetration, does not offend clearly established federal law on the sufficiency of evidence. According to the Missouri Supreme Court's reading of Mo. Rev. Stat. § 566.030.1, a live victim is not an essential element of the crime of forcible rape. A criminal defendant has no constitutional right to "proof beyond a reasonable doubt of elements *not* necessary to constitute the crime charged." *United States v. Inman*, 558 F.3d 742,

748 (8th Cir. 2009). Therefore, the sufficiency of the state's evidence that Ms. Guenther was alive when she was raped is irrelevant.

### ii. *State court interpretation of forcible rape was not impermissible* **ex post facto** *enlargement of criminal statute*

As a corollary to this claim, Petitioner challenges the constitutional propriety of the Missouri Supreme Court's retroactive interpretation of Mo. Rev. Stat. § 566.030.1. He argues that the Missouri Supreme Court's adoption of the "ongoing criminal assault" rule essentially removes an element of forcible rape (either that the victim be alive at the time the rape is perpetrated or that, at the time force is applied, the defendant intends to rape the victim) and constitutes an improper *ex post facto* judicial enlargement of a criminal statute. *See, e.g., Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964). The Supreme Court has clarified that a retroactive interpretation of a criminal statute only violates a defendant's due process rights if the interpretation is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001) (quoting *Bouie*, 378 U.S. at 354).

*Niederstadt v. Nixon*, 505 F.3d 832, 836-39 (8th Cir. 2007), involves a related Missouri criminal statute and is instructive here. In that case, the defendant had approached his victim while she was asleep and penetrated her vagina with his finger. He was convicted of forcible sodomy at the trial level, but the appellate court vacated his conviction, holding that because the victim had been asleep when

the defendant assaulted her and stopped when she awakened, there was no evidence he used "forcible compulsion" as required by the governing statute prohibiting forcible sodomy. "Forcible compulsion" is defined by statute as "[p]hysical force that overcomes reasonable resistance."[29] The Missouri Supreme Court reinstated the conviction, holding that the defendant had used the requisite physical force by merely inserting his finger in the victim's vagina.

At habeas review, the Eighth Circuit held that the Missouri Supreme Court had not unreasonably applied *Bouie* and *Rogers* in holding that the forcible coercion element was satisfied by the force inherent in a sex offense committed on a sleeping victim, who cannot resist. The circuit court noted that the holding was not "unexpected and indefensible," as required to constitute an improper *ex post facto* judicial enlargement of a criminal statute, because the state courts had long recognized – under an earlier statute prohibiting ravishment of women – that unconsented penetration of a sleeping woman necessarily involved force, even if no other force was applied and even in the face of claims exactly like that of the *Niederstadt* defendant. *Id.* at 838 (citing *State v. Welch*, 89 S.W.945 (Mo. 1905) and *State v. Atkins*, 292 S.W. 422 (Mo. 1926)).

---

[29] The forcible rape and forcible sodomy statutes include an identical "forcible compulsion" element. The Legislature amended both statutes at the same time and intended the provisions of each statute to correspond. *See id.* at 837 (quoting comment to Mo. Rev. Stat. § 566.060(1)).

Likewise, the Missouri Supreme Court did not unreasonably apply *Bouie* and *Rogers* in this case. Petitioner argues that by finding him not guilty of armed criminal action related to the rape, the jury must have disagreed with the trial court that stabbing Ms. Guenther to death fulfilled the "forcible compulsion" element of forcible rape. Assuming this is so, *Niederstadt* shows it was not objectively unreasonable for the Missouri Supreme Court to hold that the state had proffered enough evidence of forcible compulsion by proving there was force inherent in Petitioner's rape of Ms. Guenther. If a sleeping person cannot reasonably resist, *see id.* at 836, neither can a deceased person. *See Missouri v. Niederstadt*, 66 S.W. 3d 12, 15 (Mo. banc 2002) (in considering sufficiency of evidence that force was calculated to overcome reasonable resistance, a victim's "inability to resist does not inure to the benefit of the accused"). This negates the question of whether the state was constitutionally required to show Petitioner intended to rape Ms. Guenther at the time he stabbed her; he does not dispute there was evidence of his intent to rape her when he actually engaged in that conduct. Affirming his conviction based on this evidence does not run afoul of any clearly established federal law. *See also Lipham v. Georgia*, 488 U.S. 873 (1988), *denying cert. to Lipham v. State*, 364 S.E.2d 840, 842 (Ga. 1988).

# *L.     Claim 11: Failure to give jury instruction matching statute*

Petitioner argues that the trial court erred in refusing to give a jury

instruction mirroring precisely the language in Mo. Rev. Stat. § 565.032.  That

statute provides, in relevant part:

> 1. In all cases of murder in the first degree for which the death penalty is authorized, the judge in a jury-waived trial shall consider, or he shall include in his instructions to the jury for it to consider:
>
>> (1) Whether a statutory aggravating circumstance or circumstances enumerated in subsection 2 of this section is established by the evidence beyond a reasonable doubt; and
>>
>> (2) If a statutory aggravating circumstance or circumstances is proven beyond a reasonable doubt, **whether the evidence as a whole justifies a sentence of death or a sentence of life imprisonment** without eligibility for probation, parole, or release except by act of the governor. In determining the issues enumerated in subdivisions (1) and (2) of this subsection, the trier shall consider all evidence which it finds to be in aggravation or mitigation of punishment, including evidence received during the first stage of the trial and evidence supporting any of the statutory aggravating or mitigating circumstances set out in subsections 2 and 3 of this section . . . .

(emphasis added).[30]

The Supreme Court of Missouri rejected Petitioner's claim of instructional

error.  It noted that a criminal defendant is not generally entitled to particularly

worded instructions.  It held that the instructions actually given were "proper

---

[30]  The emphasized language, as it is worded in the statute, is not in the pattern instructions in the Missouri Approved Instructions–Criminal (MAI-CR).  As stated earlier, Missouri state courts in criminal cases are required to use the MAI-CR if they include an instruction relevant to the case. Missouri Supreme Court Rule 28.02(c), (f).

substitutes," *see State v. Carson*, 941 S.W.2d 518, pin (Mo. banc 1997), which had adequately informed the jurors that it was their responsibility to determine whether the evidence as a whole justified life or death. It pointed specifically to Jury Instruction 24 (in weighing the mitigating and aggravating circumstances, "you *may consider all of the evidence* presented in both the guilt and the punishment stages of trial"), Instruction 25 ("You are not compelled to fix death as the punishment" even if you do not find the mitigating circumstances outweigh the aggravating circumstances; "You must *consider all the evidence* in deciding whether to assess and declare the punishment at death"), and Instruction 26 ("if you unanimously decide, *after considering all of the evidence* and instructions of law given to you" to assess death as the punishment) (emphasis added). (L.F. 858-62.) Petitioner does not (and could not) ask this court to review the propriety of this holding. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

The Missouri Supreme Court also rejected Petitioner's argument that refusing his proffered instruction violated *Ring v. Arizona*, 536 U.S. 584 (2002). Although I have already determined that the imposition of the death penalty in this case violated the rule established in *Ring,* I do not agree that this jury instruction presents a separate constitutional problem. Petitioner argues that the language in

question – "whether the evidence as a whole justifies a sentence of death" – is a *Ring*-type prerequisite that the Constitution reserves for a jury. He claims that imposing the death penalty without separately asking the jury this question violated his Sixth Amendment right as described in *Ring*.

The success of a *Ring* claim depends on the content of state law. State law must condition eligibility for the death penalty on some determination of fact before the Sixth Amendment will protect a defendant's right to have that determination made by a jury. As the Missouri Supreme Court held, Missouri "statutes nowhere state such a finding ["whether the evidence as a whole justifies a sentence of death"] is required in order to impose a death sentence; the legislature set out the required findings in section 565.030, not section 565.032.1." *McLaughlin*, 265 S.W.3d 257, 265 (Mo. banc 2008). The finding of fact discussed in Claim 3, *is* listed in Mo. Rev. Stat. 565.030 and thereby is a state-required precondition for death-penalty eligibility, which the state has repeatedly recognized. *See, e.g.*, *Whitfield*, 107 S.W.3d at 259; *State ex rel. Baker v. Kendrick*, 136 S.W.3d 491, 491 (Mo. banc 2004). But because it was reasonable to conclude that the "evidence as a whole" language does not have the same force under state law, the Missouri Supreme Court did not unreasonably ignore *Ring* when it decided that a separate, special jury finding using that language was not constitutionally required. This claim is denied.

## M.    Claim 12: Court's exclusion of hearsay did not violate Petitioner's due process rights

In Claim 12, Petitioner argues that the court improperly excluded as mitigating evidence testimony from his cousin, Shawn Delgado.  The trial court excluded the testimony because it violated the state's hearsay rules.  On appeal, the Missouri Supreme Court held that this claim had not been presented in Petitioner's motion for a new trial and was therefore procedurally defaulted under state law.  Nonetheless, the state high court exercised its discretion to review the claim for plain error.  It found none.  *McLaughlin*, 265 S.W.3d at 273-74.

At the time this petition was filed, there was an intra-circuit split on whether an unpreserved claim reviewed by the Missouri Supreme Court for plain error could be considered by a habeas court applying a "manifest injustice" standard.  Since then, the Eighth Circuit has resolved the issue.  A procedurally defaulted claim is unreviewable by a habeas court, even if adjudicated by the state courts under discretionary plain-error review.  *Clark v. Bertsch*, 780 F.3d 873, 876-77 (8th Cir. 2015).

In a brief filed after the evidentiary hearing held in this court, Petitioner argues that his counsel's failure to preserve this claim in the motion for a new trial constitutes ineffective assistance of counsel that amounts to "cause" to excuse the procedural default.  But *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), on which he relies, was limited, for good reason and by its own terms, to claims of ineffective

assistance of trial counsel.  *Id.* at 1317-18.  It has not been extended to claims of evidentiary or other error.  *See  Dansby v. Hobbs,* 766 F.3d 809, 833 (8th Cir. 2014) (*Martinez* does not apply to claims of ineffective assistance of appellate counsel or to claims of trial error).   Therefore, it has no application here, and Claim 12 must be denied.

## VI.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit justice or judge issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A).  To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. *Id.* § 2253(c)(2); *see Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997).  A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir. 1997).  I find that reasonable jurists could not differ on any of the claims I denied, so I will deny a Certificate of Appealability on those claims.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Scott McLaughlin for writ of habeas corpus [#15] is granted as to the sentence of death only, based on Claim 1A and Claim 3 as discussed above, and denied in all other respects.

Petitioner's death penalty is vacated, and he must either be sentenced to life in prison without the possibility of parole or must be given a new penalty hearing.

An appropriate judgment granting the writ of habeas corpus is issued this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of March, 2016.