# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 18, 2021

Mr. Michael Joseph Spillane
ATTORNEY GENERAL'S OFFICE
207 W. High Street
P.O. Box 899
Jefferson City, MO  65102-0000

      RE:  18-3510  Scott McLaughlin v. Anne Precythe

Dear Counsel:

      The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

      Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

      Michael E. Gans
      Clerk of Court

NDG

Enclosure(s)

cc:   Ms. Caroline Marie Coulter
      Mr. Kent E. Gipson
      Mr. Gregory Michael Goodwin
      Mr. Stephen David Hawke
      Mr. Laurence E. Komp
      Mr. Gregory J. Linhares
      Mr. Scott McLaughlin

      District Court/Agency Case Number(s):  4:12-cv-01464-CDP

# United States Court of Appeals
*For The Eighth Circuit*

Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329

**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 18, 2021

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  18-3510  Scott McLaughlin v. Anne Precythe

Dear Sirs:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellant was Michael Joseph Spillane, AAG, of Jefferson City, MO. The following attorney appeared on the appellant brief:  Caroline Marie Coulter, AAG, of Jefferson City, MO.

Counsel who presented argument on behalf of the appellee and appeared on the brief was Laurence E. Komp, of Kansas City, MO. The following attorney also appeared on the appellee brief:  Kent E. Gipson, of Kansas City, MO.

The judge who heard the case in the district court was Honorable Catherine D Perry. The judgment of the district court was entered on November 8, 2018.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

NDG

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  4:12-cv-01464-CDP

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-3510

_____

Scott McLaughlin

*Petitioner - Appellee*

v.

Anne L. Precythe

*Respondent - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 17, 2021
Filed: August 18, 2021

_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Scott McLaughlin filed this habeas action alleging (1) he received ineffective assistance of sentencing counsel when his lawyer failed to investigate potential impeachment evidence of his own expert witness; and (2) his death sentence was unconstitutional due to flaws in the jury instructions. The district court agreed and vacated his death sentence. We disagree and reverse.

I.

A.

The night before a hearing on his adult abuse charge, Scott McLaughlin ambushed his ex-girlfriend Beverly Guenther while she was leaving work.  When Guenther told him to leave, McLaughlin attacked, stabbing Guenther repeatedly with a steak knife.  Guenther fought for her life, scratching McLaughlin's arms and face, but he forced her to the ground and continued to stab and strangle her.  Then he raped her.  Once he was finished, McLaughlin threw Guenther's body into the back seat of his car and took her to the Missouri River to dispose of her remains.  He couldn't dump her into the river because the brush was too thick.  Instead, he left Guenther's half-naked body in the brush and drove off.

The next day, McLaughlin was "laugh[ing] and jok[ing]."  App. 2336.  A friend described his demeanor as "friendly" and said that the two had "nice conversations."  *Id.*  He went shopping to buy bleach and other cleaning supplies, which he said he needed to get rid of a mildew smell in his car.  When he got home from shopping, McLaughlin poured the bleach inside his car.

Police came looking for McLaughlin and brought him in for questioning.  They found blood on his clothes and in his car.  At the station, police showed him the evidence they had against him, and McLaughlin eventually confessed and led police to Guenther's body.

The State charged McLaughlin with rape, first-degree murder, and two counts of armed criminal action and sought the death penalty.  A jury convicted him of rape, first-degree murder, and one count of armed criminal action.

B.

The case moved to the penalty phase.  In Missouri, when the State seeks a penalty of death after a jury conviction of first-degree murder, "a second stage of the trial shall proceed at which the only issue shall be the punishment to be assessed and declared."  Mo. Ann. Stat. § 565.030.4.  The trier of fact hears evidence in aggravation and mitigation of the punishment.  *Id.*  After that, the jury must find beyond a reasonable doubt that a statutory aggravator is present. *Id.* § 565.030.4(2).  If no aggravator is present, then death cannot be assessed.  *Id.*  If the jury finds a statutory aggravator, they move to the second step where they consider whether the evidence in mitigation is sufficient to outweigh the evidence in aggravation.  *Id.* § 565.030.4(3).  If the jury finds it is, then death cannot be assessed.  *Id.*  If the mitigation evidence does not outweigh the aggravation evidence, then the jury proceeds to the third step to "decide[] under all of the circumstances" whether or "not to assess and declare the punishment at death."  *Id.* § 565.030.4(4).  If they cannot, the judge must decide.  *Id.* § 565.030.4.

The State argued four statutory aggravators:  (1) the crime involved depravity of mind based on the repeated and excessive acts of physical abuse McLaughlin inflicted on Guenther; (2) the murder was committed while McLaughlin was engaged in the perpetration of forcible rape; (3) Guenther was killed because she was a potential witness in McLaughlin's burglary prosecution; and (4) Guenther was killed because she was a potential witness in an order-of-protection investigation.

In support, the State presented evidence of McLaughlin's history of stalking, harassment, and aggression towards Guenther.  Following their break-up, McLaughlin repeatedly called Guenther at work, showed up at her office uninvited, and lurked outside of her home.  Another time, police arrested McLaughlin for burglarizing Guenther's house.  After charges were filed, McLaughlin stopped Guenther in the parking lot of her work to ask about the pending case.  When Guenther told McLaughlin that she did not want to talk to him, he tried to kiss her twice.  On another occasion, McLaughlin jumped from the bushes and groped her

-3-

breast.  Guenther reported McLaughlin was becoming more violent and aggressive as time went on.

The State also presented evidence of McLaughlin's criminal history. McLaughlin had been convicted for first-degree tampering, first-degree sexual assault against a minor, forgery, and felony nonsupport.  He was also convicted of third-degree assault for attempting to cut Guenther's neighbor with a knife.

McLaughlin argued for non-statutory mitigators in his defense.  He started with a discussion of his troubled childhood.  McLaughlin's biological father was an alcoholic who abused his mother.  He was placed in multiple foster homes. Eventually, he was placed with and adopted by Louise and Harlan McLaughlin. Harlan physically abused him.  At a young age, McLaughlin was beaten with a paddle, but, as time went on, Harlan, a police officer, used a Taser and nightstick to punish him.  McLaughlin also suffered emotional abuse.  He and his siblings had their access to food limited by locks placed on the refrigerator and cabinet doors. McLaughlin's sister also recounted that Louise once forced McLaughlin to drown a kitten in a bucket of water.

Next, McLaughlin presented evidence from medical professionals.  When McLaughlin was nine, he underwent a comprehensive mental evaluation by two doctors—Dr. Anthony Udziela and Dr. Pasquale Accardo.  Both testified at the penalty phase.

Dr. Udziela talked about McLaughlin's intelligence.  He noted that McLaughlin has a low IQ and suffered from significant issues related to attachment, anxiety, and mistrust associated with the neglect he suffered at a young age.  He said that McLaughlin's childhood problems "markedly affected his development and had a major impact on him resulting in an adjustment disorder with depressed features." App. 2482.

-4-

Dr. Accardo testified about a neurodevelopmental assessment.  The test showed that McLaughlin's language skills, common sense monitoring, and cognitive ability were all deficient.  Dr. Accardo also testified that McLaughlin's attention deficit hyperactive disorder and impulsivity were neurologically based.  He further said that while McLaughlin was capable of making good choices, these limitations and McLaughlin's childhood had an impact on his ability to do so.  Dr. Accardo also observed that McLaughlin appeared to be suffering from depression.

McLaughlin then called Dr. Sripatt Kulkamthorn, his treating physician before the murder.  Dr. Kulkamthorn testified that McLaughlin struggled with depression and anxiety.  Dr. Kulkamthorn prescribed McLaughlin an antidepressant, but McLaughlin only received the pills during visits because he could not afford the prescription.

Next, Dr. Mark Cunningham, a clinical and forensic psychologist, testified about his examination of McLaughlin.  Dr. Cunningham conducted interviews with McLaughlin and several members of his biological and adoptive families and reviewed McLaughlin's medical, academic, mental health, and prison records.  He testified that McLaughlin had a choice when he killed Guenther, but that the choice was affected by risk and protective factors that pervaded his life, arising from his childhood and other factors.

At closing argument, McLaughlin's lawyer urged the jury to consider the "excessive" evidence in mitigation of McLaughlin's moral culpability.  App. 2589.  Counsel acknowledged that McLaughlin could understand the choice he made, but argued that the choice was colored by the facts and circumstances of his life.

The jury could not decide the issue of death.  In a special verdict form, the jury found the existence of a statutory aggravator—depravity of mind—beyond a reasonable doubt.  The jurors did not find unanimously that the mitigating factors outweighed the aggravating factors.  Turning to the next step, the jury could not unanimously agree on whether death was warranted under all of the circumstances.

-5-

Because the jurors were unable to agree on punishment, adjudication of the issue went to the trial judge.  The judge sentenced McLaughlin to death.

McLaughlin appealed, and the Missouri Supreme Court affirmed his death sentence.  *State v. McLaughlin*, 265 S.W.3d 257 (Mo. 2008) (*McLaughlin I*).  The court found that the State's process was consistent with *Ring v. Arizona*, 536 U.S. 584, 589 (2002), which held that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," because the jury had already found the facts necessary to make McLaughlin eligible for a death sentence.  *McLaughlin I*, 265 S.W.3d at 264.

## C.

McLaughlin filed a state habeas petition alleging that his sentencing counsel were constitutionally deficient because they failed to call a psychiatrist like Dr. Stephen Peterson, whom McLaughlin proffered in support of his petition.  If counsel had done so, he claimed, the jury would have heard evidence about McLaughlin's mental state at the time he murdered Guenther.  Specifically, he was under extreme mental or emotional disturbance which substantially impaired his ability to appreciate the criminality of his conduct.  McLaughlin alleged that if the jury heard testimony like this, it would have supported statutory mitigators and there is a reasonable probability that he would not have been sentenced to death.

In fact, McLaughlin's lawyers had such a witness—Dr. Keith Caruso—but chose not to put him on the stand because of last-minute questions about his background.  Dr. Caruso would have testified that McLaughlin was under extreme emotional disturbance and, due to mental illness, lacked the ability to appreciate the criminality of his conduct.  He would also have testified that McLaughlin was suffering from a depressive episode of bipolar disorder at the time of the murder.

Dr. Caruso was hired on the recommendation of Lisa McCulloch, a mitigation specialist.  McCulloch saw Dr. Caruso give a presentation at a death penalty legal

education program.  David Kenyon, one of the members of McLaughlin's trial team, reviewed Dr. Caruso's curriculum vitae and found he was licensed in several states but did not do more research.  Later, Robert Steele joined the trial team.  Steele did not inquire into Dr. Caruso's background because he "had no reason to think there was anything wrong with Dr. Caruso."  App. 2741.

During the jury's deliberations at the guilt phase, Dr. Caruso told McLaughlin's lawyers about potential impeachment evidence that could be used against him:  seventeen years earlier he had falsified data in a lab report.  The data was never published, so no sanctions were imposed, but there was an investigation and the information was published in the Federal Register.  Dr. Caruso said that the impeachment evidence had only been used in three of the ninety cases he testified in, and he gave counsel a list of rehabilitation questions.

While Steele knew the information could be problematic, he still planned to call Dr. Caruso.  During opening arguments of the penalty stage, Steele said the jury would hear from multiple experts, including Dr. Caruso.  The defense team later changed their mind.  At the close of the penalty stage, Steele told the State and the trial court about the decision not to call Dr. Caruso.  He said he did not believe it was ineffective to mention him in opening, but warned the prosecution not to mention Dr. Caruso in closing argument.  The prosecution argued that the defense did not present testimony about McLaughlin's state of mind at the time of the murder, but did not specifically discuss the failure to call Dr. Caruso.

The motion court denied habeas relief and found that the decision to not call Dr. Caruso was reasonable.  The motion court also found that the failure to call a psychiatrist like Dr. Peterson did not prejudice McLaughlin because Dr. Peterson's testimony was similar to the evidence of the other testifying experts.

The Missouri Supreme Court affirmed.  *See McLaughlin v. State*, 378 S.W.3d 328, 334 (Mo. 2011) (*McLaughlin II*).  On appeal, McLaughlin raised a new claim that his counsel were also ineffective for failing to investigate Dr. Caruso's

background.  *Id.* at 340.  The court denied that claim on procedural grounds, finding the argument was waived.  *Id.*

### D.

McLaughlin then filed this petition, including allegations that his sentencing counsel were ineffective for failing to investigate Dr. Caruso's credentials and that his jury instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988) and *Ring*.

After an evidentiary hearing, the district court vacated McLaughlin's death sentence.  The court found that McLaughlin's sentencing counsel were ineffective in violation of his Sixth Amendment rights for failing to investigate Dr. Caruso's reliability as a witness.  The district court found that this prejudiced McLaughlin because the potential testimony of a psychiatrist like Dr. Peterson made for a reasonable probability of a different sentencing outcome.  This was because Dr. Peterson examined McLaughlin in person and would have said that McLaughlin had a reduced capacity to conform his conduct to the requirements of the law at the time of the murder.  That evidence would have been particularly relevant, the court found, because the sentencing case was a close call, as evidenced by the jury's deadlock on the issue.  More evidence may have moved the jury enough to change the outcome.

The court also found that McLaughlin's sentencing procedure was constitutionally deficient under *Mills* and *Ring*.  As to the *Mills* claim, the court found that requiring the jury to unanimously find that the mitigating factors outweighed the aggravating factors was *per se* unconstitutional.  On the *Ring* claim, the court found that Missouri law treats the balancing stage as an issue of fact.  As an issue of fact, *Ring* would require a jury to unanimously find the mitigating factors do *not* outweigh the aggravating factors.  In reaching that conclusion, the district court relied on the Missouri Supreme Court's decision in *State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003), *abrogated by State v. Wood*, 580 S.W.3d 566, 585 (Mo. 2019), *reh'g denied* (Sept. 3, 2019), *cert. denied*, 140 S. Ct. 2670 (2020).

-8-

The State appealed.

## II.

The State first argues that McLaughlin's Sixth Amendment right to effective assistance of counsel was not violated.  "A district court's decision in a habeas claim of ineffective assistance of counsel presents a mixed question of fact and law." *United States v. White*, 341 F.3d 673, 677 (8th Cir. 2003).  "We review the ineffective assistance issue de novo, but findings of underlying predicate facts are reviewed under the clearly erroneous standard." *Id.*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient." *Id.*  "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*  "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  The State argues that McLaughlin fails both prongs.

## A.

McLaughlin claims his sentencing counsel were deficient for failing to investigate Dr. Caruso's credentials.  While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.  "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

"In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional

-9-

norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688, 689). Counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "The burden of rebutting this presumption rests squarely on the defendant." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (citation omitted).

Before addressing this challenge, we carefully delineate what this case is (and is not) about. McLaughlin takes issue with his counsel's failure to find potential *impeachment* evidence on Dr. Caruso. This issue is qualitatively different from the one presented in many of the cases relied on by the district court, which concern the failure to investigate a potential defense or inquire into the *substance* of the expert witness's testimony. A death penalty case involves mountains of evidence and many witnesses. And "[d]efense lawyers have limited time and resources, and so must choose from among countless strategic options." *Dunn*, 141 S. Ct. at 2410 (citation omitted). Finding impeachment evidence on a witness is no small task, as it can be drawn from a broad universe of information. It would be malpractice to spend too much time on such a search, disregarding other trial-related responsibilities out of fear that some obscure source might cast doubt on your witness's credibility. *Cf., e.g.*, *United States v. Jewell*, 614 F.3d 911, 926 (8th Cir. 2010) (finding a district court abused its discretion for failing to admit evidence that the adverse attorney in a witness's unrelated divorce proceedings found the witness untruthful).

We note, too, that even in the range of cases involving expert credentials, this case falls on the more attenuated side. Sometimes, the failure to investigate an expert's credentials leads to the testimony being inadmissible. *Cf. Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (citation omitted) (for expert testimony to be admissible under Rule 702, "the proposed witness must be qualified to assist the finder of fact"); *see also* Fed. R. Evid. 702. Unquestionably, a lawyer must practice some degree of diligence in ensuring the foundation is laid for the admission of an expert's testimony. *See People v. Cornille*, 448 N.E.2d 857, 865–66 (Ill. 1983)

(noting that "it is obvious that every party . . . has an obligation to verify the credentials of its expert witnesses" because the expert's credentials lay the foundation for the admission of their testimony).  Not only do these types of inquiries involve important threshold matters, they are also simpler to verify by objective criteria by using, *e.g.*, verified copies of academic transcripts.  Neither can be said for the impeachment evidence at issue here.

We turn now to case law.  We have not directly addressed the inquiry that must be made into an expert's credentials or credibility in a criminal case.  In *Dees v. Caspiri*, we suggested, in dicta, that counsel's investigation "probably was sufficient" where the expert came on the recommendation of an experienced attorney and had years of experience in the field.  904 F.2d 452, 455 (8th Cir. 1990).  Keeping *Dees* in mind, we look to other courts for further guidance.

The Sixth Circuit is the only of our sister circuits to address a similar issue.  In *Skaggs v. Parker*, the court found that the failure to investigate an expert witness's falsified academic history was not deficient where counsel had a general familiarity with and had used the witness before.  235 F.3d 261, 268 (6th Cir. 2000).  The court noted that "[g]iven the magnitude of what was at stake, and the centrality of [the defendant's] mental state to a legitimate defense, counsel should have taken more time and given more thought to their expert witness." *Id.*  Nevertheless, considering counsel's familiarity with the witness, the actions "did not fall below an objective standard of reasonableness under *Strickland*." *Id.*

Two cases from the Northern District of Illinois are also helpful.  In *United States ex rel. Hanna v. McGinnis*, counsel's failure to verify the credentials of an expert was not deficient where an expert referral service supplied the expert.  No. 90 C 7004, 1991 WL 203806, at *6 (N.D. Ill. Oct. 4, 1991).  The court expressed concern that requiring an attorney "to review every credential of each expert he retains, even an expert provided and presumably screened by a referral service, would impermissibly intrude into the realm of professional judgment and impose an unrealistic burden upon counsel." *Id.*

-11-

In *United States ex rel. Erickson v. Shomig*, the court reached a different conclusion. 162 F. Supp. 2d 1020 (N.D. Ill. 2001). There, the failure to investigate the background of the sole mitigation witness was constitutionally deficient after cross-examination showed that the expert lied about having psychology degrees and the trial judge disqualified the witness as an expert. *Id.* at 1030, 1044. The court rejected the argument that the attorney acted reasonably by relying on the recommendation of the defendant's family to hire the witness, saying that counsel should have exercised greater diligence where the witness played a central role to the defense's lone mitigation strategy. *Id.* at 1044. In the court's words, "[b]lindly putting on a single witness at a capital sentencing hearing does not satisfy" the obligation to discover and evaluate potential mitigating evidence. *Id.*

Consistent with *Skaggs* and *Hanna*, we conclude that McLaughlin did not carry his burden to show that "counsel took an approach that no competent lawyer would have chosen." *Dunn*, 141 S. Ct. at 2410. Those cases stand for the general proposition that counsel is not deficient where they reasonably rely on the professional community to vet an expert. *Accord Dees*, 904 F.2d at 455; *contra Shomig*, 162 F. Supp. 2d at 1044 (counsel deficient for relying on recommendation of defendant's family). Counsel did so here. Dr. Caruso was referred by a mitigation specialist, and Kenyon checked Dr. Caruso's curriculum vitae. The lawyers knew that Dr. Caruso was a presenter on mitigation topics at national seminars and that he had served as a witness in several other death penalty cases. McLaughlin has not shown that, under these circumstances, no competent lawyer could have made the choice to trust the legal community's appraisal of Dr. Caruso.[1]

---

[1]We recognize that reliance on a professional community alone may be insufficient in certain cases. Sometimes, preparation and discussion with an expert may reveal certain red flags about the expert's credentials. But that is not this case. McLaughlin does not point to any reason why the defense team should have made further investigation, and Steele testified that he had "no reason to think there was anything wrong with Dr. Caruso." App. 2741.

-12-

Even if further investigation was more prudent, it is not clear that the investigation should have covered the falsified lab reports. Counsel should generally investigate witness credentials to ensure testimony is admissible. *See Shomig*, 162 F. Supp. 2d at 1044; *Cornille*, 448 N.E.2d at 866. That is not what McLaughlin argues. Instead, he suggests that a broader search into Dr. Caruso was necessary and would have yielded impeachment information because a Google search returned news about the falsified lab reports. But McLaughlin's proposed search does not address the purpose of that general duty—to ensure the expert's admissibility. That sort of search would not necessarily yield the news about falsified lab reports. And surely, the Constitution does not require a scavenger hunt. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up.").

In sum, we find that McLaughlin did not overcome the presumption that counsel performed reasonably by not investigating Dr. Caruso's credentials.

## B.

The State also challenges the district court's finding that the failure to call a psychiatrist prejudiced McLaughlin. To show prejudice, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington v. Richter*, 562 U.S. 86, 111 (2011) (citation omitted). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

### 1.

The district court found that McLaughlin was prejudiced because if counsel had further investigated Dr. Caruso they could have hired another psychiatrist like Dr. Peterson. Dr. Peterson would have testified based on a face-to-face evaluation of McLaughlin and made clinical observations about his frame of mind at the time of the murder. He also would have testified that McLaughlin was under extreme duress and had a reduced capacity to conform his conduct to the requirements of the

-13-

law.  Plus, the failure to put up this witness was aggravated by sentencing counsel's mention of Dr. Caruso during opening statements, and the jury could have thought that the failure to call the witness was attributable to something else.  This problem was exacerbated by the Government's closing argument, which pointed out that McLaughlin did not present evidence about his mental state at the time of the murder.

In the district court's view, this prejudice was important in the context of what was already a close case.  The jury found only one of the four aggravating factors— depravity of mind.  Dr. Peterson's testimony would have weighed against that finding.  The jury also hung on the substantive issues of whether the mitigating evidence outweighed the aggravating evidence and whether finding death was appropriate.  As the issues were close, the case could have been swayed by introducing additional evidence relevant to the question.  *See Strickland*, 466 U.S. at 696 (a "weakly supported" conclusion is "more likely to have been affected by errors than one with overwhelming record support").

The State disagrees.  First, it says that the district court should not have considered prejudice resulting from counsel mentioning Dr. Caruso during opening argument.  Second, the State argues that Dr. Peterson's testimony would not have changed the outcome of the case.  The State says that even if Dr. Peterson's testimony had some probative value, the evidence showing depravity of mind was too strong to be outweighed by the evidence in mitigation.

We start by narrowing the scope of our analysis.  When considering prejudice, the district court found that it was relevant that McLaughlin's counsel told the jury that it would hear from Dr. Caruso.  This was error.  We have said before that "[h]abeas relief will not be granted based on the cumulative effect of attorney errors."  *Shelton v. Mapes*, 821 F.3d 941, 951 (8th Cir. 2016); *see also Forrest v. Steele*, 764 F.3d 848, 861 (8th Cir. 2014) ("By requiring that counsel's performance be 'reasonable considering all the circumstances,' *Strickland* does not purport to aggregate each discrete and potentially unrelated claim of ineffectiveness into a single performance inquiry.") (cleaned up).  By adding potential prejudice caused

-14-

by counsel's opening statements to its overarching analysis, the district court violated this rule.

Moving on, we agree with the State that Dr. Peterson's testimony would not result in a different verdict. The State provided an overwhelming amount of evidence in aggravation.[2] McLaughlin stalked and terrorized Guenther before the murder. He planned the attack, telling others that he was going to "fucking kill[] that bitch" and saying he did not "want to be locked up" because of her. App. 2317–18. He waited for Guenther outside of her work armed with a steak knife and attacked her. While Guenther scratched and screamed, McLaughlin stabbed her seven times and threw her to the ground, then strangled and raped her.[3] McLaughlin showed equal care for Guenther's body, dragging it into his car, tying Guenther's legs together with twine, and dumping the body in the brush by the Missouri River. One would expect a traumatic crime like this to induce immediate feelings of regret and remorse. Instead, McLaughlin was seen the next day laughing and joking with friends as though nothing happened. Even after his arrest, McLaughlin told one of Guenther's friends, "You're next." This evidence substantially outweighed any evidence in mitigation.

---

[2]The jury found McLaughlin acted with depravity of mind. "Depravity of mind" requires evidence to support at least one of the following factors:

> mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

*State v. Johnson*, 284 S.W.3d 561, 586 (Mo. 2009) (citation omitted).

[3]In McLaughlin's initial state appeal, he argued that he could not have raped Guenther because she was not alive at the moment of penetration. *See McLaughlin I*, 265 S.W.3d at 269. The Missouri Supreme Court rejected that theory. In any case, penetration after death would tilt even more in favor of finding McLaughlin acted with depravity of mind. *See id.* at 277 ("[I]f, as [McLaughlin] argues, the rape occurred wholly or partially after death, the crime would be even more depraved.").

-15-

Plus, Dr. Peterson's evidence would have been at least somewhat cumulative to Dr. Cunningham's testimony.  Both interviewed McLaughlin and examined his ability to conform his actions to societal standards.  At trial, Dr. Cunningham acknowledged that McLaughlin had a choice when he killed Guenther, but that the decision was influenced by certain "risk" and "protective" factors throughout his life.  Dr. Peterson would have testified that McLaughlin was suffering extreme emotional disturbance when Guenther rejected him.  This "impaired his capacity to conform his conduct to the requirements of law."  McLaughlin Br. 12.  Dr. Peterson and Dr. Cunningham's accounts overlap significantly because both suggest that the rejection by Guenther triggered pains from McLaughlin's childhood, impacting his decision to kill.

At the same time, we do not discount McLaughlin's argument to the contrary. McLaughlin says that there is a difference in the testimonies.  Dr. Peterson would have been able to testify about McLaughlin's mental state *at the time of the murder*. We recognize that the testimony of Dr. Peterson may have been better at establishing this.  In some ways, it would have been the denouement of the mitigation case:  while the testimony of the other three doctors set up the circumstances surrounding McLaughlin's life and his hardships, Dr. Peterson could have told the jury what the effect of all these circumstances was at the critical moment.  We understand the effect that this might have had on the overall trial strategy, but considering the substantial overlap and the weight of the evidence in aggravation, we do not think this evidence would have shown a "substantial" likelihood of a different result.

Even if Dr. Peterson's testimony was not cumulative, some of it is undermined by the record.  McLaughlin says that Dr. Peterson would have testified that McLaughlin was unable to appreciate the criminality of his conduct.  But McLaughlin's actions to cover up the murder say otherwise.  *See United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994) ("A defendant's attempt to conceal his commission of a crime suggests that he knows the action is wrongful . . . .").  After killing Guenther, McLaughlin tried to dump Guenther's body in the Missouri River. The next day, he cut up sections of fabric from his car's backseat and bought bleach

-16-

to clean the blood.  He knew murder was a crime.  Even before the murder, McLaughlin knew that his other actions towards Guenther were unlawful.  *See id.* ("[T]he defendant's knowledge that one crime was wrong evidences that he understood that other criminal acts were inappropriate.").  And, one of the motivating factors in killing Guenther was that he did not "want to be locked up" on the other charges Guenther filed against him.  App. 2318.  Put together, these actions are incompatible with Dr. Peterson's conclusion.

We conclude that there was not a substantial likelihood of a different result. The evidence in aggravation of the offense far outweighed the evidence in mitigation—even if bolstered by Dr. Peterson's examination.  While we think that the case is made closer by the jury deadlock, we find that the new evidence is not enough to call into question the soundness of the verdict.  *See Boyd v. Allen*, 592 F.3d 1274, 1303 (11th Cir. 2010) (denying ineffective assistance claim in jury override case despite noting that "prejudice 'is more easily shown'" in such cases) (citation omitted).

2.

On the issue of prejudice, the state habeas court found that McLaughlin was not prejudiced by sentencing counsel's failure to call a psychiatrist.  The prejudice analysis is the same one presented here:  whether there is a substantial likelihood of a different result if McLaughlin had called Dr. Peterson.  Under 28 U.S.C. § 2254(d)(1), we can only provide habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" if "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  "Taken together, [the Antiterrorism and Effective Death Penalty Act of 1996] and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted). Even if our analysis above is mistaken, we do not think the state court's decision "was contrary to, or involved an unreasonable application of, clearly established

-17-

Federal law." The required deference in Section 2254(d)(1) imposes an independent ground for reversal.

## III.

The State argues that the district court should not have considered McLaughlin's failure to investigate claim because it was procedurally defaulted when he failed to raise it in his state habeas case. "[A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In those cases, the state court's judgment "rests on independent and adequate state procedural grounds," and normally, we cannot grant relief. *Coleman v. Thompson*, 501 U.S. 722, 736 (1991).

To excuse procedural default, McLaughlin must show that his post-conviction counsel was defective with respect to a "substantial" claim. *Martinez*, 566 U.S. at 14. Post-conviction counsel cannot be ineffective for failing to raise a meritless claim. *See Grubbs v. Delo*, 948 F.2d 1459, 1464 (8th Cir. 1991) (counsel on direct appeal cannot be considered ineffective for having failed to raise a meritless issue). As McLaughlin's failure to investigate claim is meritless, the claim was not "substantial," and McLaughlin's procedural default is not excused.

## IV.

The district court also found that two constitutional issues marred McLaughlin's sentencing. First, it reasoned that the jury instructions violated *Mills* by requiring a jury to unanimously find that mitigating factors outweighed aggravating factors. Second, it found that Missouri's capital sentencing system, which permits the judge to make findings of mitigating factors, violates *Ring* because it unconstitutionally vests the authority to make factual findings in the judge.

-18-

## A.

The State disputes the district court's finding that the sentencing instructions violated *Mills*, arguing that the district court misunderstood *Mills*.  We agree.  *Mills* held that capital sentencing instructions may not "preclude[] [jurors] from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."  486 U.S. at 384; *see also Griffin v. Delo*, 33 F.3d 895, 906 (8th Cir. 1994).  In other words, jurors must be allowed to make their own decisions on which mitigating factors they think weigh against the aggravating factors.  The instructions here permitted that—they did not require unanimity on any specific mitigating factor.  *See* App. 1603 ("Does the jury unanimously find that there are facts and circumstances in mitigation of punishment sufficient to outweigh facts and circumstances in aggravation of punishment?").  In *Griffin*, we upheld a similar instruction in a Missouri death penalty case that required unanimity but allowed the jurors to consider multiple mitigating circumstances.  33 F.3d at 905.  We reverse the district court's conclusion to the contrary.

## B.

The State also challenges the district court's application of *Ring*.  This was addressed in McLaughlin's initial appeal to the Missouri Supreme Court.  Under AEDPA, the availability of federal habeas relief is narrow for claims "adjudicated on the merits" in state-court proceedings.  28 U.S.C. § 2254(d).  A state prisoner must show that the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  *White v. Woodall*, 572 U.S. 415, 426 (2014) (citation omitted).

-19-

In *Ring*, the Supreme Court held that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. The district court found that "[u]nder Missouri law, the weighing of mitigating and aggravating circumstances is a finding of fact" that can only be performed by the jury. D. Ct. Dkt. 77 at 72. To get there, the court relied on *State v. Whitfield*, 107 S.W.3d at 261, which held as much.

But the tides have changed. In McLaughlin's initial appeal, the Missouri Supreme Court found that the rule from *Whitfield* was inapplicable. *See McLaughlin I*, 265 S.W.3d at 263. And, since, the Missouri Supreme Court has disavowed *Whitfield*'s interpretation of the statute. *See Zink v. State*, 278 S.W.3d 170, 192–93 (Mo. 2009) (en banc) (counsel was not ineffective for failing to raise "meritless" argument that sentencing violated *Ring* because the weighing step is not a finding of fact); *see also Wood*, 580 S.W.3d at 585 (collecting cases). We do not sit in judgment of a state supreme court's interpretation of state law, and the district court should not have, either. Missouri's statute never required the weighing of mitigating and aggravating circumstances to be a finding of fact, *see Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) ("every statute's meaning is fixed at the time of enactment") (emphasis omitted), so it is impervious to McLaughlin's challenge.

Nor can the requirement to find mitigating factors beyond a reasonable doubt be found in any Supreme Court precedent. As a constitutional threshold, the Court has found that "[t]o render a defendant eligible for the death penalty in a homicide case, . . . the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa v. California*, 512 U.S. 967, 971–72 (1994). But the Court has refused to adopt definitive standards of proof in the context of mitigating factors, observing that "the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy." *Kansas v. Carr*, 577 U.S. 108, 119 (2016). We will not speculate whether the Court will one day require mitigating

-20-

factors to be found by a jury beyond a reasonable doubt.  For our purposes today, we need only recognize that requiring as much would be an extension of *Ring*, placing it outside our authority under Section 2254(d).  *See White*, 572 U.S. at 426.

IV.

The judgment of the district court is reversed.  The case is remanded for proceedings consistent with this opinion.

ERICKSON, Circuit Judge, concurring.

I write separately to highlight and join the district court's concerns about defense counsel's failure to conduct any type of investigation about Dr. Caruso, an expert that counsel anticipated would be his star witness during the penalty phase. Decades ago, the United States Supreme Court acknowledged "that death is a punishment different from all other sanctions in kind rather than degree." Woodson v. North Carolina, 428 U.S. 280, 303–04 (1976) (citations omitted).  "Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Id. at 305.

Here, the undisputed record shows that the impeachment evidence at issue was readily available and easily ascertainable.  Once Dr. Caruso made counsel aware of the potential impeachment evidence, the third "hit" on counsel's Google search produced a June 1994 Office of Research Integrity, U.S. Public Health Service document.  That document provided information about Dr. Caruso's misconduct, explaining that Dr. Caruso, while a student in the department of psychiatry, "altered, fabricated, and destroyed primary laboratory data."

As recognized by the majority, lawyers are tasked with exercising some degree of diligence with regard to expert testimony.  I am not convinced that

-21-

McLaughlin failed to meet his burden of showing counsel performed deficiently. Counsel's conduct in vetting the expert witness—one that he believed would be the most significant penalty phase witness—was limited to two things: (1) a review of the expert's curriculum vitae, and (2) a mitigation specialist's  recommendation based solely on watching the expert present at a seminar.  It is certainly debatable whether this vetting process meets either the low diligence standard noted by the majority or falls within the range of acceptable professional competence.  Indeed, counsel admitted on the record at trial that he believed he was ineffective in the handling of Dr. Caruso.  Counsel's concern was not that he decided against calling Dr. Caruso to testify, but that he did not investigate Dr. Caruso's background and when Dr. Caruso pointed out to him impeachment evidence, counsel failed to take the time to consider the significance of the information and proceeded to mention Dr. Caruso's anticipated testimony during opening statements.  It is these decisions that counsel acknowledged  had a prejudicial effect.  Trial. Tr. 1953–55.

In spite of my concerns related to professional competence, I concur in the result because, after carefully reviewing the record, I agree with the majority that McLaughlin is unable to show that counsel's performance prejudiced him.  Even without Dr. Caruso, as noted by the Missouri Supreme Court in McLaughlin v. State, 378 S.W.3d 328, 344 (Mo. 2012), defense counsel presented significant evidence documenting McLaughlin's intelligence issues and long-standing mental health issues ranging from personality disorders to neurological problems.  It is beyond question that the State capitalized on the absence of a defense expert who had talked to or evaluated McLaughlin recently.   Specifically, the State argued that McLaughlin's evidence should be discredited for a number of reasons, including the fact that the experts who testified had not seen or treated McLaughlin for 24 years. Notwithstanding these arguments, before the jury was extensive testimony about McLaughlin's life and his characteristics, including:

- McLaughlin's attachment and trust issues stemming from his traumatic childhood;
- McLaughlin's early antisocial behavior;

-22-

- McLaughlin's association with deviant peers;
- McLaughlin's anxiety issues;
- McLaughlin's history of treatment for depression, including McLaughlin's admission to the hospital for six days, which occurred four months before the murder, because of major depressive disorder triggered by the breakup with the victim;
- McLaughlin's intellectual deficiencies and neuro-developmental problems and how they impact McLaughlin's behavior and understanding of the world;
- McLaughlin's problems with impulse control; and
- Each of the risk factors present in the models used by the Department of Justice that "push[ed] [McLaughlin's] ramp at a very high angle in terms of predisposing him toward both alcohol abuse and towards criminality."

On the evidence before it, the jury was left with no reason to believe that any of McLaughlin's intellectual or mental health issues that began as a child had resolved or improved over time. Defense counsel presented ample evidence for a jury to find that McLaughlin was undergoing a mental health crisis at the time of the murder. The jury, however, could not unanimously agree on whether the mitigating factors outweighed the aggravating factor of depravity of mind. On this record, I cannot say that testimony from Dr. Caruso, or an alternative psychiatrist, would have made a difference in the outcome. Because McLaughlin has failed to demonstrate a reasonable probability that the outcome would have been different, McLaughlin's ineffective assistance of counsel claim fails.

With regard to the constitutional claims regarding the jury instructions and Missouri's death penalty scheme, the Missouri Supreme Court in State v. Wood, 580 S.W.3d 566, 586–87 (Mo. 2019), made clear that the only factual finding that must be made by the jury under its death penalty statute pertains to the existence of at least one aggravating circumstances (the eligibility step). The jury in this case made the necessary eligibility finding and the judge acted within his sentencing discretion

-23-

when he decided on a sentence of death.  I cannot say that the Missouri Supreme Court's decision is contrary to, or involves an unreasonable application of clearly established Supreme Court precedent, or that the decision is based on an unreasonable determination of the facts.  For these reasons, I concur.

———————————————————